JS 44(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September, 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM).

**I. (a) PLAINTIFFS**
PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE

**(b)** County Of Residence Of First Listed Plaintiff **DAUPHIN**
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**
CHAUFFEURS, TEAMSTERS, AND HELPERS LOCAL UNION NO. 771 OF LANCASTER, PENNSYLVANIA AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND JOINT COUNCIL 53
County Of Residence Of First Listed Defendant **LANCASTER**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NO.)
Vincent Candiello, Esquire
Post & Schell, P.C.
17 N. Second Street, 12th Floor
Harrisburg, PA  17101-1601
717.612.6024

ATTORNEYS (IF KNOWN)
Ira Weinstock
Ira H. Weinstock, P.C.
800 North Second Street
Harrisburg, PA  17102

**II. BASIS OF JURISDICTION** (Place an X in ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

x 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an X in ONE BOX for Plaintiff and ONE BOX for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign County | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**TORTS**
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury— Med Malpractice
☐ 365 Personal Injury— Product Liability
☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other
**LABOR**
☐ 710 Fair Labor Standards Act
☒ 720 Labor/Mgmt Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157
**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark
**SOCIAL SECURITY**
☐ 861 HIA (1395FF)
☐ 862 Black Lung(923)
☐ 863 DIWC (405(g))
☐ 863 DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
**FEDERAL TAX SUITS**
☐ 870 Taxes
☐ 871 IRS-Third Party 28 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/ Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Others
☐ 550 Civil Rights
☐ 555 Prison Condition

☐ 875 Customer Challenge 12 USC 3410

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite The U.S. Civil Statute Under Which You Are Filing And Write Brief Statement Of Cause. Do Not Cite Jurisdictional Statutes Unless Diversity.)
**29 U.S.C. §§ 141, 185**

**VII. REQUESTED IN COMPLAINT**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
Equitable Relief

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____   DOCKET NO. _____

DATE
November 4, 2010

SIGNATURE OF ATTORNEY OF RECORD
*/s/ Vincent Candiello*

FOR OFFICIAL USE ONLY
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| **PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| v. | : | |
| **CHAUFFEURS, TEAMSTERS, AND HELPERS LOCAL UNION NO. 771 OF LANCASTER, PENNSYLVANIA AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND JOINT COUNCIL 53** | : | **NO.** |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)     Habeas Corpus – Cases brought under 28 U.S.C. § 2441 through § 2255.     ( ☐ )

(b)     Social Security – Cases requesting review of a decision of the secretary of Health and Human Services denying plaintiff Social Security Benefits.     ( ☐ )

(c)     Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( ☐ )

(d)     Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( ☐ )

(e)     Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     ( ☒ )

(f)     Standard Management – Cases that do not fall into any one of the other tracks.     ( ☐ )

__November 4, 2010__                           _/s/ Vincent Candiello_____
**DATE**                                               **ATTORNEY-AT-LAW**
                                                       **Attorneys for Plaintiff**

Civ. 660 (7/95)

## UNITED STATES DISTRICT COURT                APPENDIX F

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Pennsy Supply, Inc. d/b/a Ready Mixed Concrete 1001 Paxton Street, Harrisburg, PA  17105

Address of Defendant 1025 North Duke Street, Lancaster, PA  17602

Place of Accident, incident or Transaction: Quarryville, PA
*(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed. R. Civ. P. 7.1(a))          Yes ☐          No ☒

Does this case involve multidistrict litigation possibilities:          Yes ☐          No ☒
*RELATED CASE IF ANY:*

Case Number: N/A _____   Judge: N/A _____   Date Terminated: N/A _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier number suit pending or within one year previously terminated action in this court?
   Yes ☐          No ☒
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes ☐          No ☒
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?          Yes ☐          No ☒

**CIVIL: (Place ✓ in ONE CATEGORY ONLY)**

A. *Federal Question Cases:*

Contracts

1. ☐   Indemnity Contract, Marine Contract, and All Other
2. ☐ FELA
3. ☐ Jones Act - Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☒ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability--Asbestos
9. ☐ All other Diversity Cases

(Please specify) **Misappropriation of Trade Secrets – Pennsylvania Uniform Trade Secret Act**

### ARBITRATION CERTIFICATION
*(Check appropriate category)*

I, Vincent Candiello _____, counsel of record do hereby certify:

☐   Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that, to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 exclusive of interest and cost;
☒   Relief other than monetary damages is sought.

DATE: November 4, 2010          */s/ Vincent Candiello*          49616
                                Attorney-at-Law                  Attorney I.D. #
                                NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P.38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.
DATE: November 4, 2010          */s/ Vincent Candiello*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSY SUPPLY, INC. | : | |
| d/b/a READY MIXED CONCRETE | : | |
| | : | CASE NO. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHAUFFEURS, TEAMSTERS, AND | : | ORAL ARGUMENT |
| HELPERS LOCAL UNION NO. 771 OF | : | REQUESTED |
| LANCASTER, PENNSYLVANIA | : | |
| AFFILIATED WITH THE | : | |
| INTERNATIONAL BROTHERHOOD OF | : | |
| TEAMSTERS AND JOINT COUNCIL 53 | : | |
| Defendant. | : | |

## DISCLOSURE STATEMENT FORM

Please check one box:

☒        The non-governmental corporate party, _____, in the above listed civil action does not have any parent corporation and publicly held corporation that owns 10% or more of its stock.

☐        The non-governmental corporate party,_____, in the above listed civil action has the following parent corporation(s) and publicly held corporation(s) that owns 10% or more of its stock:

_____

Date:   November 4, 2010_____                /s/ Vincent Candiello
                                                VINCENT CANDIELLO
                                                Attorney for Plaintiff,
                                                Pennsy Supply, Inc. d/b/a Ready Mixed
                                                Concrete

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSY SUPPLY, INC. | : | |
| d/b/a READY MIXED CONCRETE | : | |
| | : | CASE NO. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHAUFFEURS, TEAMSTERS, AND | : | ORAL ARGUMENT |
| HELPERS LOCAL UNION NO. 771 OF | : | REQUESTED |
| LANCASTER, PENNSYLVANIA | : | |
| AFFILIATED WITH THE | : | |
| INTERNATIONAL BROTHERHOOD OF | : | |
| TEAMSTERS AND JOINT COUNCIL 53 | : | |
| Defendant. | : | |

## DISCLOSURE STATEMENT FORM

Please check one box:

☒      The non-governmental corporate party, _____, in the above listed civil action does not have any parent corporation and publicly held corporation that owns 10% or more of its stock.

☐      The non-governmental corporate party,_____, in the above listed civil action has the following parent corporation(s) and publicly held corporation(s) that owns 10% or more of its stock:

_____

Date:   November 4, 2010_____          /s/ Vincent Candiello
                                           VINCENT CANDIELLO
                                           Attorney for Plaintiff,
                                           Pennsy Supply, Inc. d/b/a Ready Mixed
                                           Concrete

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENNSY SUPPLY, INC.                    :
d/b/a READY MIXED CONCRETE             :
                                       :    CASE NO. _____
            Plaintiff,                 :
                                       :
      v.                               :
                                       :
CHAUFFEURS, TEAMSTERS, AND             :
HELPERS LOCAL UNION NO. 771 OF         :
LANCASTER, PENNSYLVANIA                :
AFFILIATED WITH THE                    :
INTERNATIONAL BROTHERHOOD OF :
TEAMSTERS AND JOINT COUNCIL 53 :
            Defendant.                 :

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Pennsy Supply, Inc. d/b/a Ready Mixed Concrete ("Pennsy"), by its attorneys,

Post & Schell, P.C., for its Complaint in this action respectfully alleges:

### INTRODUCTION

1.      This is an action brought by Pennsy for declaratory relief regarding the

substantive non-arbitrability of a dispute arising out of a collective bargaining agreement

("CBA"), within the meaning of Section 301 of the Labor Management Relations Act, 1947, 29

U.S.C. §§ 141, 185 (the "L.M.R.A."), between Pennsy and the Chauffeurs, Teamsters, and

Helpers Local Union No. 771 of Lancaster, Pennsylvania affiliated with the International

Brotherhood of Teamsters and Joint Council 53 ("Union")

7067335v1

### JURISDICTION AND VENUE

2.      Subject matter jurisdiction is proper in this Court pursuant to 29 U.S.C. §§ 185 (a) and (c) and 28 U.S.C. § 1331.

3.      Venue is proper within the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because Defendant is located and conducts business in this judicial district, and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred with the Eastern District of Pennsylvania.

### AMOUNT IN CONTROVERSY

4.      This action is brought without respect to the amount in controversy, in accordance with Section 185 (a) of the L.M.R.A., 29 U.S.C. § 185 (a).

### PARTIES

**The Plaintiff**

5.      Plaintiff is a corporation organized under the laws of Pennsylvania with its principal place of business located at 1001 Paxton Street, Harrisburg, Pennsylvania 17105.

6.      Plaintiff is the owner and operator of multiple concrete supply facilities located in Lancaster County, PA.

7.      Plaintiff is an "employer" within the meaning of Title 29 U.S.C. § 152(2).

**The Defendant**

8.      Defendant is the local chapter of the International Brotherhood of Teamsters under Joint Council 51 (the "The Union"). The Union represented employees at a former Lancaster facility and currently represents employees at the above-referenced Quarryville facility.

9.     The Union maintains offices within the Commonwealth of Pennsylvania at 1025 North Duke Street, Lancaster, Pennsylvania 17602.

10.     The Union is a "Labor Organization" within the meaning of Title 29 U.S.C. § 152(5).

## BACKGROUND

11.     Pennsy purchased Ready Mixed Concrete Company of Lancaster, Pennsylvania ("RMC") in 2007.

12.     At the time of the purchase, RMC owned two facilities in Lancaster County, Pennsylvania located respectively in Lancaster and Quarryville, Pennsylvania.

13.     RMC also had a collective bargaining relationship with the Union covering both of its Lancaster and Quarryville facilities. RMC and the Union then were parties to a collective bargaining agreement ("CBA") which expired by its terms on March 31, 2010. A true and correct copy of the expired CBA is attached hereto as **Exhibit A**.

14.     At the time of purchase, Pennsy became a successor to RMC and assumed the preexisting CBA with the Union.

15.     The CBA then expired by its terms on March 31, 2010, and Pennsy d/b/a as Ready Mixed Concrete did not agree to extend its terms beyond that date.

16.     Pennsy also owns and operates another concrete and aggregate facility in Landisville, Pennsylvania, which is non-unionized.

17.     Due to a significant decline in the construction business generally, the need for significant capital investment at the Lancaster facility, and the age of that facility, Pennsy closed the former RMC Lancaster facility in October 2008. Pennsy reassigned the employees from the Lancaster facility to the former RMC Quarryville facility which was re-opened with the hope of

3

generating business in the southern Lancaster County area. Pennsy does not anticipate re-opening the Lancaster facility.

18.     Unfortunately, Pennsy was not successful in securing sufficient work in the southern Lancaster County area and then closed the Quarryville facility for the winter of 2008. Since that time, Pennsy only has reopened the Quarryville facility sporadically and for relatively short periods of times to the present.

19.     By the summer of 2009, the Landisville facility was in need of additional drivers. Accordingly, in June 2009, Pennsy and the Union entered into a agreement which assigned four (4) unionized drivers from the Quarryville facility to the Landisville facility. This agreement was memorialized in a Side Letter Agreement which expired by its terms at the end of 2009.

20.     On February 26, 2010, Pennsy and the Union entered into a second, letter agreement again permitting the assignment of four (4) unionized drivers from the Quarryville facility to the Landisville facility for the term beginning March 1, 2010, until the expiration of the CBA on March 31, 2010.

21.     Starting in March 2010, Pennsy began negotiations with the Union for a new collective bargaining agreement. The Union was represented in the negotiations by James S. Wardrop, Jr., the business agent for the Union.

22.     In response to direct questions from Pennsy, Mr. Wardrop declared that he had the authority to negotiate on behalf of the Union and to agree to the terms of a successor collective bargaining agreement.

23.     The negotiations between the parties concluded on Tuesday, April 6, 2010, with complete agreement on a successor collective bargaining agreement. Some of the key points agreed to were as follows:

4

       a.      The Union withdrew a previous demand that the non-unionized Landisville facility be added to the Union Recognition Article of the agreement;

       b.      The parties agreed that the company would have no duty to dispatch work upon any territorial lines and that the dispatching of work was at the sole discretion of Pennsy; and

       c.      The parties also agreed to a third Side Letter Agreement allowing Quarryville drivers to continue to allow unionized drivers to be assigned work out the Landisville facility for the length of the new agreement. A true and accurate copy of the Side Letter Agreement is attached hereto as **Exhibit B**.

24.     That same day, April 6, 2010, the parties acknowledged complete agreement as to all terms of the new collective bargaining agreement (the "Labor Agreement") and shook hands at the table. A true and accurate copy of the Labor Agreement is attached hereto as **Exhibit C**.

25.     While it was understood that the Labor Agreement would be signed by Howard Rhinier, Secretary-Treasurer for the Union, the parties never agreed that a condition of the Labor Agreement required the approval of Mr. Rhinier.

26.     The parties never agreed that a condition of the Labor Agreement required successful ratification by union members covered by the Agreement.

27.     On Wednesday, April 14, 2010, the Union repudiated the Labor Agreement raising the following five reasons for repudiation:

       a.      The Side Letter Agreement would violate the Labor Agreement's Seniority Clause as it allowed a non-union driver to be assigned the first load of the day from the non-union Landisville facility;

       b.      Pennsy's unwillingness to include the Landisville facility in the Union Recognition Article of the labor agreement;

       c.      The inability of the Union employees to meet participation requirements for the Teamster Health & Welfare and Pension Fund while working at the Landisville facility if the facility was not listed in the Labor Agreement;

       d.      The need for Pennsy to contribute to the Teamster Health & Welfare and Pension Fund on behalf of non-union employees working with the Teamster employees; and

e.      The Union's complete inability to enter into side letter agreements.

28.      By letter dated April 15, 2010, Pennsy rejected a demand by the Union to alter the Labor Agreement and noted, among other issues, that a valid labor contract was agreed to by the parties on April 6, 2010.  In the same letter, Pennsy withdrew the April 6, 2010 Side Letter Agreement noting the Union's objection to it; demanded the Union execute the agreed-to labor agreement; and gave notice that it intended to implement the April 6, 2010 Labor Agreement on April 23, 2010.

29.      On April 21, 2010, due to the Union's continued repudiation of the Labor Agreement, Pennsy implemented the Labor Agreement.

30.      On April 22, 2010, the Union filed Grievance Nos. 51857-58.  Those grievances allege violations of the CBA concerning Pennsy's failure to assign certain work to the Unionized drivers.

31.      On or about April 29, 2010, Pennsy sent the Union a copy of charges it proposed to file with the National Labor Relations Board ("NLRB") on April 30, 2010, due to, among other things, the Union's repudiation of the Labor Contract.

32.      On or about Apri 30, 2010, Pennsy filed the NLRB charges and re-offered the Side Letter Agreement to the Union, without conditions, to allow Union drivers to receive assignments at the non-union Landisville facility until the NLRB decided whether to issue a complaint on the pending charges.

33.      The Union never responded to Pennsy's April 30, 2010 re-offer of a Side Letter Agreement.

34.      On or about May 6, 2010, the Union notified Pennsy that it was going to arbitration on Grievance Number 51857.

35.     On or about May 25, 2010, the Union filed Grievance No. 51859 which again alleged violations of the CBA concerning Pennsy's failure to assign certain work to the Unionized drivers.

36.     On or about June 7, 2010, the Union filed unfair labor practice charges with the NLRB against Pennsy for its unilateral implementation of the April 6, 2010 Labor Agreement.

37.     On or about June 24, 2010, the Union filed two more grievances, Grievance Nos. 51861 and 51862, which again alleged violations of the CBA concerning Pennsy's failure to assign certain work to the Unionized drivers.

38.     On or about July 30, 2010, the Union withdrew its NLRB charge against Pennsy regarding Pennsy's implementation of the Labor Agreement.

39.     On August 26, 2010, Grievance Numbers 51857, 51589, 51861 and 51862 were consolidated.  Those Grievances are scheduled for arbitration on December 8, 2010, before the American Arbitration Association.

40.     On or about August 27, 2010, the NLRB issued a complaint against the Union for repudiating the Labor Agreement.  A true and accurate copy of the NLRB Complaint is attached hereto as **Exhibit D**.

41.     The NLRB complaint alleges that Pennsy and the Union came to full agreement on April 6, 2010, as to the Labor Agreement and the April 6, 2010 Side Letter Agreement.

42.     On September 2, 2010, Pennsy notified the Union that it would be implementing the April 6, 2010 Side Letter Agreement.

43.     The American Arbitration Association has informed Pennsy that, unless the parties agree to postpone the scheduled arbitration or unless it is enjoined, it intends to hold the December 8, 2010 Arbitration as scheduled.

44.    The NLRB hearing currently is scheduled for November 12, 2010.

45.    On or about September 2, 2010, the Union filed its answer to the NLRB Complaint and denied that the parties had come to a complete agreement on the Labor Agreement at the April 6, 2010 meeting.

46.    On September 15, 2010, the Union filed Grievance Number 51937 alleging that Pennsy's implementation of the April 6, 2010 Side Letter Agreement violated the CBA. To date, the Union has not sought arbitration of Grievance Number 51937.

47.    By e-mail dated October 4, 2010, Pennsy requested that the Union agree to postpone the December 8, 2010 Arbitration.

48.    The Union denied Pennsy's request for a postponement of the December 8, 2010 Arbitration.

## COUNT I

## DECLARATORY JUDGMENT THAT THE CBA NO LONGER IS VALID AND THAT PENNSY NO LONGER CONSENTS TO ARBITRATE ANY DISPUTE UNDER THE CBA.

49.    Paragraphs 1 though 48 are incorporated by reference and are re-alleged.

50.    All of the grievances currently set for arbitration allege violations of the expired CBA.

51.    All of the actions about which the Union seeks arbitration allegedly occurred on and after April 1, 2010.

52.    Accordingly, a fundamental question exists regarding the December 8, 2010 Arbitration which is whether there exists a valid labor agreement between the parties which provides for the arbitration of the underlying dispute.

53. The United States Supreme Court has recently made clear that the validity of a collective bargaining agreement in which the parties purportedly agree to arbitration must be decided by a court and cannot be arbitrated. Granite Rock Company v. International Brotherhood of Teamsters et al., 130 S.Ct. 2847 (June 24, 2010).

54. Further, in Litton Fin. Printing Div. v. NLRB, 501 U.S. 190 (1991), the United States Supreme Court held:

> We acknowledge that where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, there exists a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate.

(Internal quotations and citation omitted).

55. This Honorable Court has the authority to grant declaratory relief pursuant to Title 28 U.S.C. § 2201(a).

56. Pennsy has demonstrated a reasonable probability of success on the merits of the underlying issue because the CBA has expired and there is no agreement to extend the terms thereof.

57. As the Union has refused to delay the arbitration and as the issue of the validity of the CBA is fundamentally at issue in the December 8, 2010 Arbitration, a refusal by this Honorable Court to grant injunctive relief sought would result in Pennsy being forced to arbitrate under the CBA at a time Pennsy no longer consents to arbitrate under that instrument.

58. Granting the requested relief will not result in greater harm to the Union because Pennsy already has implemented all of the Labor Agreement, including the April 6, 2010 Side

Letter Agreement. Either the CBA is valid or not. Asking the Union to simply postpone the pending arbitrations until this litigation resolves what agreement is valid will not result in any harm to the Union.

59. The public interest will be served by granting the requested relief because it is important to ensure grievances are arbitrated under the correct and applicable CBA and not to allow a party to attempt to enforce an expired agreement that the party simply "likes better" than the one it subsequently accepted.

WHEREFORE, PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE, respectfully requests that this Honorable Court enter a Declaratory Judgment regarding the rights, remedies, and legal obligations of the parties to this lawsuit, and specifically, declare that PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE, has no obligation to arbitrate any grievance under the CBA either at the December 8, 2010 Arbitration or at any other time. Second that this Court issue injunctive relieve to postpone the arbitration scheduled for December 8, 2010.

## COUNT II

**DECLARATORY JUDGMENT THAT THE LABOR AGREEMENT TOGETHER WITH THE APRIL 6, 2010 SIDE LETTER AGREEMENT CONSTITUTES THE ONLY AGREEMENTS WHICH ARE VALID BETWEEN PENNSY AND THE UNION.**

60. Paragraphs 1 though 59 are incorporated by reference and are re-alleged.

61. Pennsy and the Union came to complete agreement on April 6, 2010, for a successor collective bargaining agreement to the CBA.

62. The successor collective bargaining agreement referenced in Paragraph 62, above, includes the Labor Agreement and the April 6, 2010 Side Letter Agreement.

10

WHEREFORE, PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE, respectfully requests that this Honorable Court enter a Declaratory Judgment regarding the rights, remedies, and legal obligations of the parties to this lawsuit, and specifically, declare that the Labor Agreement and the April 6, 2010 Side Letter Agreement comprise the only valid, successor collective bargaining agreements to the CBA.

Respectfully Submitted,

POST & SCHELL, P.C.

November 4, 2010

/s/ Vincent Candiello
Vincent Candiello, Esquire
17 N. 2nd Street, 12th Floor
Harrisburg, PA 17101
(717) 731-1970
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENNSY SUPPLY, INC.              :
d/b/a READY MIXED CONCRETE    :
                                :     CASE NO. _____
      Plaintiff,            :
                                :
      v.                  :
                                :
CHAUFFEURS, TEAMSTERS, AND     :
HELPERS LOCAL UNION NO. 771 OF  :
LANCASTER, PENNSYLVANIA      :
AFFILIATED WITH THE             :
INTERNATIONAL BROTHERHOOD OF :
TEAMSTERSAND JOINT COUNCIL 53  :
      Defendant.          :

## VERIFICATION

I, **Melissa Martin-Devitz,** on behalf of Plaintiff, Pennsy Supply, Inc. d/b/a Ready Mixed Concrete, verify that I am authorized to take this verification on behalf of said Plaintiff, and that the averments of facts set forth in the foregoing Complaint Directed to Defendants are true and correct to the best of my personal knowledge, information, and belief. The undersigned understands that the statements made therein are subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Dated: November 4, 2010                      _____

12

# EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN

## READY MIXED CONCRETE COMPANY OF LANCASTER

## AND

## TEAMSTERS LOCAL UNION NO. 771

## AFFILIATED WITH THE

## INTERNATIONAL BROTHERHOOD OF TEAMSTERS

## EFFECTIVE APRIL 1, 2007, THROUGH MARCH 31, 2010

PENNSY 0001

This Agreement made and entered into by and between READY MIXED CONCRETE COMPANY OF LANCASTER, PENNSYLVANIA (hereinafter referred to as the Employer), and CHAUFFEURS, TEAMSTERS, AND HELPERS LOCAL UNION NO. 771 OF LANCASTER, PENNSYLVANIA, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS and JOINT COUNCIL NO. 53 (hereinafter referred to as the Union).

Witnesseth that for the propose of mutual understanding and in order that a harmonious relationship may exist between the Employer and the Union, to the end that continuous and efficient service will be rendered to and by both parties for the benefit of both, it is hereby agreed that:

## ARTICLE I - UNION RECOGNITION

The Employer recognizes the Union as the sole collective bargaining agency for its truck drivers, helpers, mechanics, yard persons, and plant persons employed by the Employer. This Agreement shall not be construed to extend to or affect, in any way, executive or supervisory help.

## ARTICLE II - UNION SECURITY

Section 1.

All present employees who are members of the Local Union on the effective date of this Agreement shall remain members of the Local Union in good standing as a condition of employment. All present employees who are not members of the Local Union and all employees who are hired hereafter shall become and remain members in good standing of the Local Union as a condition of employment on and after the 31st day following the beginning of their employment or on and after

1

PENNSY 0002

the 31st day following the date of this Agreement. This provision shall be made and become effective as of such time as it may be made and become effective under the provisions of the National Labor Relations Act, but not retroactively.

The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect that Union membership was available to such person on the same terms and conditions generally available to other members, to forthwith discharge such person. Further, the failure of any person to maintain his Union membership in good standing as required herein shall, upon written notice to the Employer by the Union to such effect, obligate the Employer to discharge such person.

In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union security which may be lawfully permissible.

No provision of this Article shall apply in any state to the extent that it may be prohibited by state law. If under applicable state law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

If any provision of this Article is invalid under the law of any state wherein this Agreement is executed, such provision shall be modified to comply with the requirements of state law or shall be re-negotiated for the purpose of adequate replacement. If such negotiations shall not result in a mutually satisfactory agreement, the Union shall be permitted all legal or economic recourse.

Section 2. D.R.I.V.E. Authorization and Deduction

The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the

2

Employer of the amounts designated by each contributing employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which the Employee has earned a wage. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check, the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck. The International Brotherhood of Teamsters shall reimburse the Employer annually for the Employer's actual cost for the expenses incurred in administering the weekly payroll deduction plan.

Section 3. Credit Union Deduction.

The Employer agrees to deduct certain specific amounts each week from the wages of those employees who shall have given the Employer written notice to make such deductions. The amount so deducted shall be remitted to Teamsters Local No. 771 Credit Union no later than the payday of each week. The Employer shall not make deductions and shall not be responsible for remittance to the Credit Union for any deductions for those weeks during which the employee's earnings shall be less than the amount authorized for deductions.

Section 4. 401 (k) Plan.

Employer shall have no obligation to make any contribution, pay any fee, or otherwise incur any expense in association with the Teamsters National 401 (k) Plan. Union shall provide Employer with necessary information in connection with the Teamsters National 401 (k) Plan, including a copy of the Plan document, Summary Plan Description, and any other information necessary for legal compliance of the Employer.

3

PENNSY 0004

## ARTICLE III - WAGES AND HOURS

Section 1:

(a) The rate or pay per hour for all classes of employees covered by this Agreement shall be:

|  | Effective 4/1/2007 | Effective 4/1/2008 | Effective 4/1/2009 |
|---|---|---|---|
| Drivers | $16.55 | $17.05 | $17.55 |
| Mechanics | $17.30 | $17.80 | $18.30 |
| Yard Person | $16.55 | $17.05 | $17.55 |
| Batch Person | $16.66 | $17.16 | $17.56 |
| Shop Leader | $17.55 | $18.05 | $18.55 |
| Master Plant Op. | $17.66 | $18.16 | $18.56 |
| Yard Leader | $17.55 | $18.05 | $18.55 |

Section 2:

Eight (8) hours shall constitute a day's work. All time worked in excess of eight (8) hours shall be paid as time and one-half time. At the start of each day, senior qualified employees shall have preference of all overtime. At the end of each day, overtime occurrence shall be assigned according to seniority as far as it is practical. All time worked on Saturdays shall be paid at the rate of time and one-half.

Section 3: Report Guarantee and Start Guarantee:

- 1.25 hours or less, paid for two hours
- 1.25 hours to 3.5 hours, paid for four hours
- 3.5 hours to 6 hours, paid for six hours
- Anything over 6 hours, paid for his full time

4

- Start time by 8:30
- Guaranteed start time shall be by 8:30 A.M. each day, unless otherwise agreed upon between employer and employee. Any employee ordered to and reporting for work on Saturday, Sunday or paid holidays shall be guaranteed a minimum of four (4) consecutive hours pay. Notice of start time shall be given the day before. Employees shall be notified at least one (1) hour before shift start and given a reasonable amount of time to start (one (1) hour). Employees shall be notified one (1) hour in advance if they are not to report.
- Trial period for duration from 4/1/07 to 2/1/10, at which time the practice will be returned to the previous contract language.
- When drivers are to be sent home at the beginning of the day, senior drivers will receive the option to leave first.

### Section 4:

When an employee is relieved from duty during the day and called back to work at a later hour, he shall be paid for the total number of hours from the beginning of his work day until he is through at the end of the day's work.

### Section 5:

Employer shall compensate Employee for all loss of earning power caused by employees appearing at court trials, etc., in defense of Employer and shall reimburse employees for expenses involved.

### Section 6:

- 30 minute lunch between 11:00 AM and 12:30 PM
- Regular rate paid if work through lunch, seniority preference for no lunch

5

PENNSY 0006

▫ No direct or intentional punishment or repercussions against an employee that decides to pass on a no lunch to take a lunch break.

Section 7: Shift Differential

Employees shall be paid an additional fifty (.50) cents per hour for all mutually agreed upon starts between 12:00 a.m. and 4:00 a.m. If an employee starts during the aforementioned start times, the shift differential will stay in place until the end of his shift.

## ARTICLE IV - SUNDAYS AND HOLIDAYS

The following shall be recognized as paid holidays for which the employee shall receive eight (8) hours pay at the regular hourly rate:

| | | |
|---|---|---|
| New Year's Day | Good Friday | Christmas Day |
| Memorial Day | Thanksgiving Day | Labor Day |
| Independence Day | Day after Thanksgiving | One (1) Personal Holiday |

One (1) additional Personal Holiday will be given to each employee upon reaching his tenth (10th) year anniversary.

Employee shall be able to use personal holiday or holidays as paid sick days.

All time worked on Sundays and Holidays shall be paid at the rate of double time.

6

PENNSY 0007

Any newly hired employee who has been employed for at least ninety (90) calendar days prior to one (1) of the above specified holidays shall be entitled to receive holiday pay.  A regular employee shall receive eight (8) hours pay for any specified holiday provided said employee worked in the thirty (30) calendar day period prior to the holiday.

## ARTICLE V - VACATIONS

All employees who have been in the service of the Employer shall receive the following vacation with pay, scheduled by the Employer according to seniority, beginning on April 1, 2005:

| One | (1) Year of Service | One | (1) Week of Vacation |
|-----|---------------------|-----|----------------------|
| Three | (3) Years of Service | Two | (2) Weeks of Vacation |
| Seven | (7) Years of Service | Three | (3) Weeks of Vacation |
| Fifteen (15) Years of Service | | Four | (4) Weeks of Vacation |

The employee must be a regular employee in accordance with the provisions of this Agreement, and must have one (1) year's service from his established seniority date before he is eligible for his first week's vacation.  Thereafter, employee's seniority date or employment anniversary date shall be used only to determine the number of weeks vacation employee is entitled to in each contract year.

Employees who have worked 1000 hours or more during the preceding contract year shall be eligible for vacation earned.  Vacation, holiday, and overtime hours, as well as time spent on compensable illness or injury shall count as time worked for the purpose of qualifying for vacation.  Vacations shall be granted during the twelve (12) month period, April 1, through March 31 of the following year.  All

7

PENNSY 0008

vacations will be selected in seniority order with three (3) employees allowed off at the Lancaster Plant and two (2) off at the Quarryville plant.

In the event of merger, purchase, etc., employees with four (4) or more years seniority shall be protected from the qualifying provisions of this Article for a period of one (1) year.

When an employee becomes permanently disabled, he shall qualify for his vacation period only during the contract year in which such permanent disability occurs.

An employee does not qualify for a vacation or pay in lieu thereof when, prior to his bid or assigned vacation period, he resigns or quits.

All vacations will be posted on the Union bulletin board and a copy sent to the Local's Union Hall.

## Section 2:

Vacation Request Slips will be handed out before December 31. If an employee is not available, slips will be mailed to the employee's current address. Vacation Slips must be returned by February 15, of the new year. Employees who fail to return Vacation Slip by February 15 will forfeit their seniority rights for vacation selection. There will be no reminders posted.

## ADDENDUM "A" March 14, 1989

Any employee who sells back their vacation week to the employer will be working at the bottom of the seniority list. The employee, who actually works on their vacation week, will waive all seniority and will be working as an extra employee and will not claim any seniority for that day or week's work.

## Section 3:

8

PENNSY 0009

No employee may take more than two weeks at a time without approval.

## ARTICLE VI - DEATH IN THE FAMILY

In the event of death in the immediate family (spouse, father, mother, brother, sister, son, daughter, stepparent, stepchild, mother-in-law, father-in-law or common law spouse) employee shall be given three (3) working days off with pay. In the event of death of other than the immediate family (grandchild or grandparents of the employee), the employee shall be given one (1) work day off with pay to attend the funeral.

If business allows, one (1) additional day without pay will be granted without fear of reprisal.

An employee shall be given three (3) workdays off with pay for the express purpose of attending services for the deceased provided the period between the day of death and the day of the services are working days.

## ARTICLE VII - HEALTH AND WELFARE

Section 1.   Employer Contributions.

(a)   The Employer agrees to make the following monthly contributions to the Central Pennsylvania Teamsters Health and Welfare Fund (the Fund), for each Eligible Employee covered by this Agreement in order to qualify such employee for benefits in accordance with the terms of the Declaration of Trust and the Central Pennsylvania Teamsters Health and Welfare and the Central Pennsylvania Teamsters Health and Welfare Fund - Plan No. 14, executed by the Employer subject to the qualifications hereinafter specified:

9

Effective June 1, 2007, contribution due 6/15/07, for benefit coverage commencing 7/1/07 – $873.00 per employee per month.

Effective June 1, 2008, contribution due 6/15/08, for benefit coverage commencing 7/1/08 – Rate to be determined by the Central Pennsylvania Teamsters Health and Welfare Fund.

Effective June 1, 2009, contribution due 6/15/09, for benefit coverage commencing 7/1/09 – Rate to be determined by the Central Pennsylvania Teamsters Health and Welfare Fund.

NOTE:    The above schedule is only intended to set out what the contribution rates are, and when they are subject to change.  Eligibility for a contribution is based on the language set forth in Section 2, below.

(b)    The above-listed rate shall include the Base Benefits and the following Optional Plan "A" Benefits:

    #1 – Death and Dismemberment
    #2 – Dental
    #3 – Medical – Office Visits
    #4 – Mental/Substance Abuse
    #5 – Short-Term Disability
    #6 – Prescriptions
    #8 - Vision and Hearing

(c) Employer is responsible for the collection of all co-payments amounts by employees.  Co-payments are to be designated as follows:

Effective June 1, 2007 through March 31, 2010 - $10.00 per week for Individual.

Effective June 1, 2007 through March 31, 2010 - $20.00 per week for Individual w/dependents.

(d)    Monthly contributions for each eligible employee shall be paid not later than the fifteenth (15th) day of the month.

10

(e)   The Employer shall use the reporting forms required by the Trustees of the Fund (the Trustees) and shall comply with the instructions of the Trustees in filling out such forms.

(f)   The Company will pay one-half (1/2) of the Cobra rate to the employee on short-term layoff and has not attained his required sixty (60) hours. The employee has the option to either pay his one-half (1/2) of the Cobra payment or make no payment, in which the employee would not have any health & welfare coverage. Short –term layoff will be defined as not more than three (3) months. Cobra will be reset each year upon renewal.

Section 2.   Eligibility of Employees

(a)   Any newly hired employee shall qualify for benefit coverage as of the first day of the month immediately following the Employer's first contribution if such employee meets the requirements of subsection (b) below.

(b)   An employee shall be deemed to be an eligible employee entitled to a contribution if such employee has been credited with at least sixty (60) hours or employee punch-in for fifteen (15) days or more for the Employer during the preceding calendar month immediately following his probationary period. (For example: An employee who has completed his probationary period as of October 17 and has been credited 60 hours in the month of October, therefore, the contribution is due November 15 for benefit coverage effective December 1.)

Section 3.   Audit and Penalties

The Trustees shall have the authority to audit the payroll and wage records of the Employer for the purpose of determining the accuracy of the contributions to the Central Pennsylvania Teamsters Health and Welfare Fund. The audit shall be completed at a mutually agreeable time and at no cost to the Employer. In the

11

PENNSY 0012

event, it is found that the Employer has not been complying with the provisions of this Agreement, the Employer shall pay the following:

(1) The full cost of audit;

(2) Any damages allowed by law based on the above or on any other amounts which should have been paid to the Fund on behalf of an Eligible Employee.

In the event, an Employer is charged with any of the costs hereinabove set forth, the Employer may proceed in accordance with the Grievance Procedure provided elsewhere in this Agreement.

Section 4.   Union Protection.

In the event the specified contributions are not paid by the fifteenth (15th) day of the month, as above provided, the proper Union official may issue to the Employer a delinquent notice requesting payment within seventy-two (72) hours; if all delinquent contributions are not paid within that period, the employees of such employer and their representatives shall have the right to take such action as may be necessary until the delinquent payments are made.  It is further agreed that in the event such action is taken, the Employer shall be responsible to the Employees for losses resulting therefrom.

Any and all claims for an eligible employee which should be covered and have not been covered because of contribution deficiencies shall be the responsibility of the Employer.

Section 5.   Employer Contributions During Employee Disability.

The Employer shall make a contribution on behalf of an eligible employee who has not otherwise qualified under Section 13.2 above, and who is disabled because

12

PENNSY 0013

of accident or illness and unable to perform the work assigned to him by the Employer, during the following periods:

| Pay Monthly Contributions for: | When the Employee has been Employed: |
|---|---|
| 3 months | less than one (1) year |
| 6 months | one (1) year to three (3) years |
| 9 months | more than three (3) years |
| 12 months | for occupational injury |

## ARTICLE VIII - PENSION FUND

### Section 1. Employer Contributions:

(a)     The Employer agrees to make the following monthly contributions to the Central Pennsylvania Teamsters Pension Fund (the Fund) for each eligible employee covered by this Agreement, in accordance with the Declaration of Trust Agreement and Defined Benefit Level __F__, and the Retirement Income Plan executed by the Employer, subject to the qualifications hereinafter specified:

Effective April 1, 2007 .................... $405.00 per Employee per month

Effective April 1, 2008 ...................... $455.00 per Employee per month

Effective April 1, 2009 ...................... $505.00 per Employee per month

(b)     Monthly contributions for each Eligible Employee shall be paid not later than the fifteenth (15th) day of the following month.

(c)     The Employer shall use the reporting forms required by the Trustees of the Fund (the Trustees) and shall comply with the instructions of the Trustees in

13

PENNSY 0014

filling out such forms. This applies both to contributions which are payable and to reporting the hours of service for each Eligible Employee.

## Section 2. Eligibility of Employees

(a)    All existing employees, and all new employees shall be eligible for participation in and for contributions to the Fund after they have been on the payroll of the Employer for thirteen (13) weeks.

(b)    In determining the initial thirteen (13) week period, a new employee shall be deemed to be on the payroll of the Employer each week they are assigned and work three (3) separate work periods during one (1) work week, or are assigned and work twenty (20) hours or more in less than three (3) separate work periods during one (1) work week.

(c)    The specified monthly contributions shall be paid beginning with the month in which an employee has completed thirteen (13) weeks of employment.

(d)    After completing the thirteen (13) weeks of employment, the specified contribution shall be paid for each calendar month an employee is credited with seventy (70) hours or more, regardless as to classification of casual, probationary, temporary, etc. If an Eligible Employee is credited with less than 70 hours in a calendar month, the Employer shall report to the Trustees the actual hours credited even though no contribution is due.

## Section 3. Audit and Penalties

The Trustees shall have the authority to audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Pension Fund. The audit shall be completed at a mutually agreeable time and at no cost to the Employer.  In the event it is found that the Employer has not been

14

complying with the provisions of this Agreement, the Employer shall pay the following:

(1) The full cost of the audit;

(2) Any damages allowed by law based on the above or on any other amounts which should have been paid to the Fund on behalf of an Eligible Employee.

In the event an Employer is charged with any of the costs hereinabove set forth, the Employer may proceed in accordance with the Grievance Procedure provided elsewhere in this Agreement.

## Section 4. Union Protection

In the event the specified contributions are not paid by the fifteenth (15th) day of the following month, as above provided, the proper Union official may issue the contributing Employer a delinquent notice requesting payment within seventy-two (72) hours; if all delinquent contributions are not paid within that period, the employees of such Employer and their representatives shall have the right to take such action as may be necessary until the delinquent payments are made. It is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting therefrom.

Any and all claims for an Eligible Employee which should be covered and have not been covered because of contribution deficiencies shall be the responsibility of the Employer.

## Section 5. Employer Contributions During Employee Disability

(a) The Employer shall make a contribution on behalf of an eligible employee, who has not otherwise qualified under Section 2 above, and who is

PENNSY 0016

disabled because of accident or illness and unable to perform the work assigned to them by the Employer, during the following periods:

| Pay monthly Contribution For: | When Employee has been Employed: |
|---|---|
| 3 Months | Less than 5 Years |
| 6 Months | 5 Years to 10 Years |
| 9 Months | More than 10 Years |
| 12 Months | For occupational injury |

(b)    The stated initial thirteen (13) week period of eligibility shall not apply to an employee who becomes disabled on the job. The Employer agrees to pay the monthly contributions for an employee disabled on the job according to the schedule listed above, regardless of whether or not that employee has completed his initial period of eligibility.

(c)    When absence because of accident or sickness disability begins on or before the fifteenth (15th) day of the month, the monthly contribution for that month shall be deemed the first contribution for accident or sickness disability.

(d)    When absence because of accident or sickness disability begins on or after the sixteenth (16th) day of the month, the monthly contribution for the following month shall be deemed the first contribution for accident or sickness disability.

(e)    The Employer shall resume regular monthly contributions when an employee has returned to work after absence because of accident or sickness disability:

(1) Beginning with the month during which the employee returns to work, when they return to work on or before the fifteenth (15th) day of the month.

16

(2) Beginning with the month following his return to work when he returns to work on or after the sixteenth (16th) day of the month.

## ARTICLE IX - SENIORITY

Section 1.

(a)   Seniority is measured by length of continuous service with the Employer.

(b)   Review at 30 days for probationary period, if not granted full status, then the process will go for the full sixty (60) calendar day probationary period, during which period employee may be terminated or disciplined without further recourse.   The grievance procedure shall not apply to Employee during probationary period.   The Employer is not required to give an explanation for termination or discipline during such period. The Employer shall advise the Local Union, in writing, when a probationary employee is terminated or disciplined.

(c)   In engaging or dismissing employees because of lack of business, the Employer shall conform to the ordinary rules of seniority; in promoting employees to jobs within this Agreement, the Employer shall have the right to select qualified persons, but between qualified persons, preference shall be given according to seniority.

(d)   If a front discharge truck with a junior employee on overtime is dispatched at the same time a rear discharge truck with a senior man is available, the company must produce evidence that the customer demanded a front discharge truck. The Company reserves the right to send a FDM if it feels it is in the best interest of the company for that order.

(e)   In the case of temporary layoff, the employees will be given the opportunity to volunteer for layoff. This voluntary layoff will be conducted by classification, with the most senior employees being given the opportunity to

17

accept the layoff in lieu of junior employees being forced to layoff status. When the senior employee's cobra rate goes to the full rate, the senior employee will be able to bump the junior employee into layoff status. Once the junior employee goes into layoff status, the employee will be given the opportunity to pay his cobra rate for three (3) months at one-half (1/2) rate.

## Section 2: Selection of Men

When the Employer needs additional men, he shall give the Local Union equal opportunity with all other sources in finding suitable applicants, but the Employer shall not be required to hire those referred by the Local Union.

## Section 3: Classification of Men

Classifications recognized under this Agreement shall be:

Driver
Batch Person
Mechanic
Yard Person
Shop Leader
Master Plant Operator
Yard Leader

Employer shall post all new jobs and permanent vacancies and list classifications. Awards to be made to senior qualified employee. Job assignments shall be made in accordance with the above classification recognizing seniority within each classification.

Employees presently performing these jobs should be classified as such.

There shall be a ninety (90) work day probationary period for the classification of batch person. This shall include any new hires and regular employees bidding such.

18

PENNSY 0019

Section 4: Classification Description

The job classification of driver is responsible for, but not limited solely to, the following tasks: driving a concrete truck, general maintenance on the truck and keeping it in a presentable condition, and is required to assist as needed in maintaining the plant and yard.

The job classification of shop leader is responsible for, but not limited solely to, the following tasks: to organize and run the shop, to report to management any unsafe vehicles, to delegate work between himself and the other mechanics, and to inspect Company vehicles for use. The shop leader will be responsible for evaluating new equipment that is added to the fleet. This position has no authority in terms of hiring, firing, or suspending any fellow worker.

The job classification of mechanic is responsible for, but not limited solely to, the following tasks: maintaining safe vehicles for use, for repairing damaged vehicles or equipment, and aiding the shop leader as directed. Mechanics shall notify shop leader or management of any unsafe or faulty equipment.

The job classification of master plant operator-dispatcher is for a position at the Quarryville plant, when it is in use. This position is responsible for, but not solely limited to, operating and maintaining the plant, for scheduling and supervising drivers for dispatch purposes, and to coordinate operations with the yard supervisor. This position has no authority in terms of hiring, firing, or suspending any fellow worker.

The job classification of batch person is responsible for batching out orders taken by the dispatcher. The position is responsible for helping coordinate with the dispatcher to best maximize the Company's work force and service customer.

The classification of yard leader is responsible for, but not solely limited to, the following tasks: coordinating the yard and driver activities, such as assigning tasks

19

and work schedules, coordinating with the dispatcher and plant superintendent, coordinating work with the shop leader, and be responsible for testing of materials, thus requiring a Penn Dot certification. This position has no authority in terms of hiring, firing, or suspending any fellow worker. This position is not required to be filled at all times.

The classification of a yard person is responsible for, but not solely limited to, the following tasks: loading the bins, helping maintain an orderly yard, and assisting the yard leader with other tasks. In the event that no yard leader is present, a yard person may be required to assume some of his duties.

## ARTICLE X - GENERAL PROVISIONS

### Section 1. Written or Verbal Agreements

It is agreed by the party of the first part that no employee will be asked to make any written or verbal agreement which in any way conflicts with this Agreement.

### Section 2. Time Reports

It is agreed that time reports may not be erased or changed. However, in case of dispute, differences must be settled in the presence of the Shop Steward, particular employee involved, and particular individual who has supervision of time reports. Should the aforementioned individuals find it necessary to change the time reports, it must be done in their presence.

### Section 3. Equipment

Employer shall not hire equipment until his own available usable equipment is exhausted.

20

PENNSY 0021

### Section 4. Loss or Damage

An employee shall not be compelled to pay for loss or damage to freight or equipment unless it shall be proven that such loss or damage was caused directly by his willful negligence.

### Section 5. Military Service

Employees called for military service shall retain their places on the seniority list provided they are able to perform the work and have applied for work within ninety (90) days after discharge from military service.

### Section 6. Batch Person

A worker in the classification of batch person at a Ready Mixed plant may be allowed to return to driver classification provided the following steps are taken:

1. Employee must notify Employer thirty (30) days in advance of his intention to return to driver classification. This can be extended if mutually agreed upon.

2. It is understood that the employee loses his batch person classification entirely. He has no seniority rights in batch person classification once he leaves.

3. Employee returns to driver classification at no loss of seniority in driver classification.

4. In the event of an emergency, vacation or other extenuating circumstances, the company reserves the right to require the former batch person to return to batch person classification, on a temporary basis.

If Lancaster becomes a one person plant, a Union batchman could also be responsible for dispatching, loading bins and yard supervision.

21

Section 7. Family Medical Leave

The Company will comply with the Family Medical Leave Act as the law requires.

Section 8. Time off for Union Activities

The Employer agrees to grant the necessary time off without discrimination or loss of seniority rights and without pay, to any employee designated by the Union to attend a Labor Convention or serve in any capacity on other Union Business, provided two (2) weeks written notice is given to the Employer by the Union, specifying length of time off. Should business levels change in the two (2) week notification period, the Union will be notified by the Employer and adjustments made to accommodate both parties. The Union agrees that, in making its request for time off for Union activities, due consideration shall be given to the number of people affected in order that there shall be no disruption of the Employer's operation due to lack of available employees.

Agreements between the individual Employer and the Local Union involved regarding employees on Leave of Absence because of employment by the Union, shall prevail. A Union member elected or appointed to serve as a Union Official shall be granted a Leave of Absence during the period of employment in such position without discrimination or loss of seniority rights and without pay.

Section 9.

Management can only do bargaining unit work when there are no qualified Union employees available to do the work. If employees are in the layoff mode, said employees will be notified of the work and brought in to perform the task. Until the employee is at the work site, management will be able to perform the assignment.

22

## Section 10:

Equipment added to the fleet and assigned to operations on a regular basis, whether newly manufactured or not newly manufactured will be air-conditioned if mechanically possible. This will be done at the Company's earliest convenience.

Equipment added to the fleet and assigned to operation on a regular basis whether newly manufactured or not newly manufactured will be fitted with compression brakes if mechanically possible. This will be done at the Company's earliest convenience.

## Section 11:

On days of slow business, management can elect to bring in a group of workers in order to maximize efficiency. This will be done by bringing in the most senior group of workers that can accomplish a given task. (This does not mean the most senior employees will be brought in for the period, but rather, the most senior group that can accomplish a given set of tasks for that duration will be utilized). During these periods, employee's may/shall be required to perform work in other job classifications in order to ensure productivity.

## New Section 12

Management, on an individual basis, may elect to have a multi-skilled junior employee work over a senior employee, if it is practical to have a multi-skilled employee (i.e. one that can run loader, drive dump truck, etc.) and the senior employee is not considered multi-skilled. Should it become practical to train a more senior employee, or if the temporary position may become of a more extended nature, the company will afford an employee an opportunity to learn if it

23

PENNSY 0024

is deemed reasonable. The company also encourages that when a senior employee is passed over for a multi-skilled employee, that the senior employee, on his own time, comes to work and spends time with the aforementioned junior employee, so he as well can become multi-skilled in this area.

## ARTICLE XI - JOB STEWARDS

The Employer recognizes the right of the Union to designate Job Steward and Alternate. The authority of Job Steward and Alternate so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

1. Investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement. The investigation and the presentation of grievances will be done on company time. The investigation will be done in a timely fashion and shall cause no disruption to the Employer's operation;

2. Collection of dues when authorized by appropriate Local Union action;

3. Transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

a. have been reduced to writing, or

b. if not reduced to writing, are of a routine nature and do not involve work stoppage, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

Job Steward and Alternate have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.

24

The Employer recognizes these limitations upon the authority of Job Steward and Alternate, and shall not hold the Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event Shop Steward has taken unauthorized strike action, slowdown, or work stoppage in violation of its Agreement.

Stewards shall be permitted to investigate, present, and process grievances on or off the property of the Employer, without loss of time or pay, during working hours. Such time spent in handling grievances shall be considered working hours in computing daily and/or weekly overtime.

## ARTICLE XII - PROTECTION OF RIGHTS

Section 1. Picket Lines:

It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a primary labor dispute or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's place of business.

Section 2. Struck Goods:

It shall not be a violation of this Agreement and it shall not be a cause for discharge or disciplinary action if any employee refuses to perform any service which his Employer undertakes to perform as an ally of an Employer or person whose employees are on strike and which service, but for such strike, would be performed by the employees of the Employer or person on strike.

25

PENNSY 0026

# ARTICLE XIII - GRIEVANCE PROCEDURE

Section 1.

A grievance is hereby jointly defined to be any controversy, complaint, misunderstanding, or dispute. Any grievance arising between the Employer and the Union or an Employee represented by the Union shall be settled in the following manner:

1. The aggrieved employee or employees must present the grievance to the Job Steward within five (5) working days after the reason for the grievance has occurred, except no time limit shall apply in case of violation of wage provisions of this Agreement. If a satisfactory settlement is not effected with the foreman within three (3) working days, the Job Steward and employee shall submit such grievance in writing to the Union's Business Representative.

2. The Business Representative shall then take the matter up with a representative of the Employer with authority to act upon such grievance. A decision must be made within five (5) working days.

3. If the Employer fails to comply with any settlement of the grievance or fails to comply with the procedures of this Article, the Union has the right to take all legal and economic action to enforce its demands.

Section 2.

Any Job Steward shall be permitted to leave his or her work to investigate and adjust the grievance of any employee within his jurisdiction, after notification to his supervisor. Employees shall have the Job Steward or a representative of the Union present during the discussion of any grievance with representatives of the Employer.

26

## Section 3.

The Union or the Employer may, in order to resolve a grievance involving contractual language, suspension or discharge prior to arbitration, utilize either a state or federal mediation at this step. Both the Employer and the Union must mutually agree to this step. Additionally, both parties must agree if the decision of the mediator will be final and binding.

# ARTICLE XIV - ARBITRATION PROCEDURE

## Section 1.

If no satisfactory settlement can be agreed upon, the parties shall select a mutually agreeable and impartial arbitrator within ten (10) days after disagreement. In the event they are unable to so agree, the matter shall be referred to the American Arbitration Association the next day. After the service submits a list of arbitrators to the Union and the Employer, they shall reply with their preferred selections no later than three (3) days after receipt of such list. The expense of the Arbitrator selected or appointed shall be borne equally by the Employer and the Union.

## Section 2.

The Arbitrator shall not have the authority to amend or modify this Agreement or establish new terms or conditions under this Agreement. The Arbitrator shall determine any question of arbitrability. In the event the position of the Union is sustained, the aggrieved party shall be entitled to all the benefits of this Agreement which would have accrued to them had there been no grievance.

27

Section 3.

. Both parties agree to accept the decision of the Arbitrator as final and binding. If the Employer is to comply with the award of the Arbitrator or with the procedures of this Article, the Union has a right to take all legal and economic action to enforce compliance.

## ARTICLE XV - DISCHARGE OR SUSPENSION

Section 1.

The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension, shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, except that no warning notice need be given to any employee before employee is discharged if the cause of such discharge is: dishonesty; proven theft; drunkenness; drinking alcoholic beverages, or while under the influence of alcoholic beverages, narcotics, or unlawful drugs; the use of narcotics, barbiturates, or amphetamines; the possession of unlawful drugs; refusal to submit to a breathalyzer, other sobriety or blood alcohol test; recklessness resulting in a serious accident while on duty; failure to report an accident; unprovoked assault on the Employer, Employee, or supervisor; carrying of unauthorized passengers; or willful abuse of Employer's equipment.

The warning notice as herein provided shall not remain in effect for a period of more than nine (9) months from the date of occurrence upon which the complaint and warning notice are based.

The warning notice shall be issued no later than seven (7) days from the date the Employer became aware of the occurrence.   If the Company places the

28

employee under a letter of investigation the action waives the seven (7) day time frame. This letter of investigation is good for thirty (30) days from the incident.

Four step process:

1. Verbal/written warning
2. 1 day suspension
3. 3 day suspension
4. Termination

For all offenses, no new process for each offense in a nine month period.

Section 2.

Any employee discharged must be paid in full all wages owed them by the Employer, including earned vacation pay, after employee has exhausted all avenues of the grievance procedure.

Section 3.

A discharged or suspended employee must advise their Local Union in writing within five (5) working days after receiving notification of such action against them, of their desire to appeal their discharge or suspension. Notice of appeal from discharge or suspension must be made to the Employer in writing within ten (10) days from the date of the discharge or suspension and/or return to their home terminal, whichever is later.

Section 4.

Should it be proven that an injustice has been done to a discharged or suspended employee, they shall be fully reinstated in their position and compensated at their usual rate of pay for lost work opportunity. If the Union and the Employer are unable to agree as to the settlement of the case, then it may be

PENNSY 0030

the Employer are unable to agree as to the settlement of the case, then it may be referred to the grievance machinery as set forth in Article XIV, within five (5) days after the above notice of appeal is given to the Employer.

## ARTICLE XVI - MAINTENANCE OF STANDARDS

The Employer agrees that any covered employee whose wages or fringe benefits exceed those set forth in the Agreement shall suffer no reduction of wages or fringe benefits during the term of this Agreement.

## ARTICLE XVII - LIE DETECTOR TEST

The Employer shall not require, request, or suggest that an employee or applicant for employment take a polygraph or any other form of lie detector test.

## ARTICLE XVIII- NONDISCRIMINATION POLICY

Section 1.

The Employer and the Union shall not discriminate against any individual in contradiction of federal, state or local laws with respect to hiring, compensation, terms, or conditions of employment based upon the individual's race, religion, color, sex, age (over forty), national origin, veteran's status or non-job related physical, mental disability or sexual preference. The Age Discrimination in Employment Act of 1967 and the Pennsylvania Human Relations Act prohibit discrimination on the basis of age with respect to individuals who are at least 40 years of age. The Americans with Disabilities Act prohibits discrimination against qualified individuals with a disability.

30

Section 2.

The Employer and the Union agree that there will be no discrimination by the Employer or the Union against any employee because of any employee's lawful activity and/or support of the Union.

## ARTICLE XIX - CHECKOFF

Section 1.

From the pay for the third week of each month, the Employer shall deduct the dues which may be due by the employee for the next succeeding month for any employee who shall have authorized, in writing, the Employer to so deduct dues. In the case of a new employee, the Employer shall, from the first pay after the expiration of thirty (30) days from commencement of employment, deduct the whole initiation fee. All sums deducted shall be remitted to an authorized agent of the Union not later than the first day of each month.

Section 2.

The Employer will recognize a lawful, voluntary authorization for the Teamsters Political Action Committee deduction from wages, to be transmitted by the Local Union to such Committee as the Local Union may lawfully designate. The Teamsters Political Action Committee deduction shall be made annually.

## ARTICLE XX - JURY DUTY

In the event an employee is called for jury duty by a court of the Commonwealth of Pennsylvania or by the Federal Court of the district within

31

which the employee resides, and if the employee loses all or part of his working time on account of such jury service, the company shall supplement the pay received by such employee for such jury duty in an amount sufficient to provide such employee up to a maximum of one (1) jury term in any one (1) year period, with wages equal in amount to wages such employee would have received from the Employer for straight time work had the employee been available for work during such period of time. Employees called for jury duty shall notify the Employer as soon as practicable, but in no event later than five (5) days after jury notice is received.

## ARTICLE XXI - MANAGEMENT

### Section 1:

The management of the work, the direction of the working force, assignment of workers to specific projects and the right to hire and discharge for just cause are vested exclusively in the Company. It is not the intention of this provision to encourage the discharge of employees.

### Section 2:

The number of workers in any classification to be employed shall be at the sole discretion of the employer. The size of the working force shall be considered a function of the Company's business and decisions regarding the number of workers to be employed rest solely with the Company.

### Section 3:

Decisions regarding the use of land and equipment owned by the Company shall be left solely to the Company. The Company recognizes its responsibility to comply with applicable safety standards.

32

PENNSY 0033

Section 4:

All the provisions of this Article shall be subject to all the other provisions of this Agreement.

PENNSY 0034

## ARTICLE XXI - TERM OF AGREEMENT

This agreement shall become effective as of April 1, 2007 until and including March 31, 2010, and shall continue in full force and effect from year to year, for one (1) year periods, unless either party shall notify the other by certified letter, not later than sixty (60) days prior to the expiration date in 2010 or in subsequent year, of an intention to have same changed.

IN WITNESS WHEREOF the parties have hereunder set their hands and seals.

For the Union:

_____
Howard W. Rhinier
Secretary-Treasurer

For the Employer:

_____
Jeff Stauffer
President

_____
James S. Wardrop, Jr.
Business Agent

_____
Chad Sweigart
Vice-President

34

PENNSY 0035

# EXHIBIT B

Side Letter Agreement Proposal
April 22, 2010

This Agreement is offered by and between Pennsy Supply, Inc d/b/a Ready Mixed Concrete, 139 North Church Street, Quarryville, PA 17566 (hereinafter referred to as the Employer), and Chauffeurs, Teamsters, and Helpers Local Union No. 771 of Lancaster, Pennsylvania, affiliated with the International Brotherhood of Teamsters and Joint Council No. 53 (hereinafter referred to as the Union).

The following are guidelines for bringing only the currently employed Quarryville union drivers to work out of the Landisville plant.  Both parties agree all obstacles will be worked out in amicable manner without disrupting business.

- Non union driver in first, 2nd driver in union, alternate from there with non union always being first in each day
- This applies to Drivers only
- End of day – 1st in, 1st out as needed

It is understood that, if Quarryville opens, required drivers will report to Quarryville with the remainder continuing out of Landisville based on the original list as stated above.

This agreement shall become effective upon execution and continue until the National Labor Relations Board shall determine whether to go to complaint or dismiss the charges to be filed by the Employer regarding whether the parties had agreement on all lawful subjects regarding their tentative Labor Agreement and whether the Union's filing of Grievance No. 51857 constitutes a failure to bargain in good faith.  Neither the offer of nor execution of this Agreement by either party is without prejudice to the positions the parties may take before the NLRB, the courts, or the American Arbitration Association.

In Witness whereof the parties have hereunder set this hands and seals.

For the Employer:                                                For the Union:


_____                          _____
Toni M. Robertson
Vice President of Human Resources


_____                          _____
Melissa M. Devitz
HR & Labor Relations Director


_____
Brian P. Groff
Vice President of Concrete

# EXHIBIT C

This Agreement made and entered into by and between **PENNSY SUPPLY, INC. d/b/a READY MIXED CONCRETE, 139 North Church Street, Quarryville, PA 17566 (hereinafter referred to as the Employer), and CHAUFFEURS, TEAMSTERS, AND HELPERS LOCAL UNION NO. 771 OF LANCASTER PENNSYLVANIA, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS and JOINT COUNCIL No.53.**

Witnesseth that for the propose of mutual understanding and in order that a harmonious relationship may exist between the Employer and the Union, to the end that continuous and efficient service will be rendered to and by both parties for the benefit of both, it is hereby agreed that:

## ARTICLE I – UNION RECOGNITION

The Employer recognizes the Union as the sole collective bargaining agency for its truck drivers, helpers, mechanics, yard person, and plant persons employed by the Employer at Quarryville. This Agreement shall not be construed to extend to or affect, in any way, executive or supervisory help.

## ARTICLE II – UNION SECURITY

Section 1.

All present employees who are members of the Local Union on the effective date of this Agreement shall remain members of the Local Union in good standing as a condition of employment.   All present employees who are not members of the Local Union and all employees who are hired hereafter shall become and remain members in good standing of the Local Union as a condition of employment on and after the 31st day following the beginning of their employment or on and after the 31st day following the date of this Agreement. This provision shall be made and become effective as of such time as it may be made and become effective under the provisions of the National Labor Relations Act, but not retroactively.

The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect

that Union membership was available to such person on the same terms and conditions generally available to other members, to forthwith discharge such person. Further, the failure of any person to maintain his Union membership in good standing as required herein shall, upon written notice to the employer by the Union to such effect, obligate the Employer to discharge such person.

In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union security which may be lawfully permissible.

No provision of this Article shall apply in any state to the extent that it may be prohibited by state law. If under applicable state law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

If any provision of this Article is invalid under the law of any state wherein this Agreement is executed, such provision shall be modified to comply with the requirements of state law or shall be re-negotiated for the purpose of adequate replacement. If such negotiations shall not result in a mutually satisfactory agreement, the Union shall be permitted all legal or economic recourse.

Section 2. D.R.I.V.E. Authorization and Deduction

The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing, employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which the Employee has carried a wage. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check, the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck. The International Brotherhood of Teamsters shall reimburse the Employer annually for the Employer's actual cost for the expenses incurred in administering the weekly payroll deduction plan.

Section 3. Credit Union Deduction

The Employer agrees to deduct certain specific amounts each week from the wages of those employees who shall have given the Employer written notice to make such deductions. The amount so deducted shall be remitted to Teamsters Local No. 771 Credit Union no later than the

payday of each week. The Employer shall not make deductions and shall not be responsible for remittance to the Credit Union for any deductions for those weeks during which the employee's earnings shall be less than the amount authorized for deductions.

Section 4. 401 (k) Plan

Employer shall have no obligation to make any contribution, pay any fee, or otherwise incur any expense in association with the Teamsters National 401 (k) Plan. Union shall provide Employer with necessary information in connection with the Teamsters National 401(k) Plan, including a copy of the Plan document, Summary Plan Description, and any other information necessary for legal compliance of the Employer.

## ARTICLE III - WAGES AND HOURS

Section 1.

The rate of pay per hour for all classes of employees covered by this Agreement shall be:

| | Effective 04/01/2010 $0.10 | Effective 04/01/2011 $0.25 | Effective 04/01/2012 $0.50 |
|---|---|---|---|
| Driver | $17.65 | $17.90 | $18.40 |
| Mechanic | $18.40 | $18.65 | $19.15 |
| Batch Person | $17.66 | $17.91 | $18.41 |
| Yard Leader | $18.66 | $18.91 | $19.41 |

Section 2.

Eight (8) hours shall constitute a day's work. All time worked in excess of eight (8) hours shall be paid as time and one-half time. At the end of each day, work will be allocated to the first driver in, first driver out, based on demand.   All time worked on Saturdays shall be paid at the rate of time and one-half.

Section 3.  Report Guarantee and Start Guarantee:

> 1.25 hours or less, paid for two hours
>
> 1.25 hours to 3.5 hours, paid for four hours
>
> Start time by 9:00 a.m.

Guaranteed start time shall be by 9:00 a.m. each day, unless otherwise agreed upon between employer and employee. Any employee ordered to and reporting for work on Saturday, Sunday or paid holidays shall be guaranteed a minimum of four (4) consecutive hours pay. Notice of start time shall be given the day before. Employees shall be notified at least one (1) hour before shift start and given a reasonable amount of time to start (one (1) hour). Employees shall be notified one (1) hour in advance if they are not to report. When drivers are to be sent home at the beginning of the day, senior drivers will receive the option to leave first.

Section 4.

When an employee is relieved from duty during the day and called back to work at a later hour, he shall be paid for the total number of hours from the beginning of his work day until he is through at the end of the day's work.

Section 5.

Employer shall compensate Employee for all loss of earning power caused by employees appearing at court trials, etc., in defense of Employer and shall reimburse employees for expenses involved.

Section 6.

Employees may be required to take a 30 minute unpaid lunch period between their 4th and 6th hour of work. This lunch break will be at the discretion of central dispatch.

## ARTICLE V - VACATIONS

All employees who have been in the service of the Employer shall receive the following vacation with pay, scheduled by the Employer according to seniority, beginning on April 1, 2005:

One (1 ) Year of Service ................... One (1) Week of Vacation
Three (3) Years of Service ............... Two (2) Weeks of Vacation
Seven (7) Years of Service .............. Three (3) Weeks of Vacation
Fifteen (15) Years of Service..............Four (4) Weeks of Vacation

The employee must be a regular employee in accordance with the provisions of this Agreement, and must have one (1) year's service from his established seniority date before he is eligible for his first week's vacation. Thereafter, employee's seniority date or employment anniversary date shall be used only to determine the number of weeks vacation employee is entitled to in each contract year.

Employees who have worked 1000 hours or more, during the preceding contract year shall be eligible for vacation earned. Vacation, holiday, and overtime hours, as well as time spent on compensable illness or injury shall count as time worked for the purpose of qualifying for vacation. Vacations shall be granted during the twelve (12) month period, April l, through March 31 of the following year. All vacations will be selected in seniority order with two (2) employees allowed off at a time. The Company will allow up to 4 employees off for the first two days of buck season each year.

Section 7. Shift Differential

Employees shall be paid an additional fifty cents per hour for all mutually agreed upon start times between 12:00 a.m. and 5:00 a.m. If an employee starts during the aforementioned start times, the shift differential will stay in place until the end of his shift.

## ARTICLE VI - SUNDAYS AND HOLIDAYS

The following shall be recognized as paid holidays for which the employee shall receive eight (8) hours pay at the regular hourly rate:

| | | |
|---|---|---|
| New Year's Day | Good Friday | Christmas Day |
| Memorial Day | Thanksgiving Day | Labor Day |
| Independence Day | Day after Thanksgiving' | One (1) Personal Holiday |

One (1) additional Personal Holiday will be given to each employee upon reaching his tenth (10th) year anniversary.

Employee shall be able to use personal holiday or holidays as paid sick days.

All time worked on Sundays and Holidays shall be paid at the rate of double time.

Any newly hired employee who has been employed for at least ninety (90) calendar days prior to one (1) of the above specified holidays shall be entitled to receive holiday pay. A regular employee shall receive eight (8) hours pay for any specified holiday provided said employee worked in the thirty (30) calendar day period prior to the holiday.

In the event of merger, purchase, etc., employees with four (4) or more years seniority shall be protected from the qualifying provisions of this article for a period of one (1) year.

When an employee becomes permanently disabled, he shall qualify for his vacation period only during the contract year in which such permanent disability occurs.

An employee does not qualify for a vacation or pay in lieu thereof when, prior to his bid or assigned vacation period, he resigns or quits.

All vacations will be posted on the Union bulletin board and a copy sent to the Local's Union Hall.

Section 2:

Vacation Request Slips will be handed out before December 31. If an employee is not available, slips will be mailed to the employee's current address. Vacation Slips must be returned by February 15, of the new year. Employees who fail to return Vacation Slips by February 15 will forfeit their seniority rights for vacation selection. There will be no reminders posted.

ADDENDUM "A" March 14, 1989

Any employee who sells back their vacation week to the employer will be working at the bottom of the seniority list. The employee, who actually works on their vacation week, will waive all seniority and will be working as an extra employee and will not claim any seniority for that day or week's work.

Section 3:

No employee may take more than two weeks at a time without approval.

## ARTICLE VII - DEATH IN THE FAMILY

In the event of death in the immediate family, (spouse, father, mother, brother, sister, son, daughter, stepparent, stepchild, mother-in-law, father-in-law or common law spouse) employee shall be given three (3) working days off with pay. In the event of death of other than the immediate family (grandchild or grandparents of the employee), the employee shall be given one (1) work day off with pay to attend the funeral.

If business allows, one (1) additional day without pay will be granted without fear of reprisal.

An employee shall be given three (3) workdays off with pay for the express purpose of attending services for the deceased provided the period between the day of death and the day of the services are working days.

## ARTICLE VIII – HEALTH AND WELFARE

Section 1. Employer Contributions

(a) The Employer agrees to make the following monthly contributions to the Central Pennsylvania Teamsters Health and Welfare Fund (the Fund), for each Eligible Employee covered by this Agreement in order to qualify such employee for benefits in accordance with the terms of the Declaration of Trust and the Central Pennsylvania Teamsters Health and Welfare and the Central Pennsylvania Teamsters Health and Welfare Plan No. 14, executed by the Employer subject to the qualifications; hereinafter specified:

Effective June 1, 2010 contribution due 06/15/10, for benefit coverage commencing 07/01/10 – Rate to be determined by the Central Pennsylvania Teamsters Health and Welfare Fund.

Effective June 1, 2011, contribution due 06/15/11, for benefit coverage commencing 07/01/11 - Rate to be determined by the Central Pennsylvania Teamsters Health and Welfare Fund.

Effective June 1, 2012, contribution due 6/15/12, for benefit coverage commencing 07/01/12 - Rate to be determined by the Central Pennsylvania Teamsters Health and Welfare Fund.

NOTE:  The above schedule is only intended to set out what the contribution rates

7

are, and when they are subject to change. Eligibility for a contribution is based on the language set forth in Section 2, below.

(b)     The above-listed rate shall include the Base Benefits and the following

Optional Plan "A" Benefits:
# 1 - Death and Dismemberment
#2 - Dental
#3 - Medical- Office Visits
#4 - Mental/Substance Abuse
#5 - Short-Term Disability
#6 - Prescriptions
#7 - Vision and Hearing

(c)     Employer is responsible for the collection of all co-payments amounts by employees. Co-payments are to be designated as follows:

Single Rate – 18% of plan cost – deducted weekly

Employee + Spouse Rate – 17% of plan cost – deducted weekly

Family Rate – 18% of plan cost – deducted weekly

(d)     Monthly contributions for each eligible employee shall be paid no later than the fifteenth (15th) day of the month.

(e)     The Employer shall use the reporting forms required by the Trustees of the Fund (the Trustees) and shall comply with the instructions of the Trustees in filling out such forms.

(f)     The Company will pay one-half (1/2) of the COBRA rate to the employee on short-term layoff and has not attained his required sixty (60) hours. The employee has the option to either pay his one-half (1/2) of the COBRA payment or make no payment, in which the employee would not have any health & welfare coverage. Short term layoff will be defined as not more than three (3) months.

COBRA will be reset each year upon renewal.

8

Section 2. Eligibility of Employees

(a)     Any newly hired employee shall qualify for benefit coverage as of the first day of the month immediately following the Employer's first contribution if such employee meets the requirements of subsection (b) below.

(b)     An employee shall be deemed to be an eligible employee entitled to a contribution if such employee has been credited with at least sixty (60) hours or employee punch-in for fifteen (15) days or more for the Employer during the preceding calendar month immediately following his probationary period. (For example: An employee who has completed his probationary period as of October 17 and has been credited 60 hours in the month of October, therefore, the contribution is due November 15 for benefit coverage effective December 1.)

Section 3. Audit and Penalties

The Trustees shall have the authority to audit the payroll and wage records of the Employer for the purpose of determining the accuracy of the contributions to the Central Pennsylvania Teamsters Health and Welfare Fund. The audit shall be completed at a mutually agreeable time and at no cost to the Employer. In the event, it is found that the Employer has not been complying with the provisions of this Agreement, the Employer shall pay the following:

(1)     The full cost of audit;

(2)     Any damages allowed by law based on the above or on any other amounts which should have been paid to the Fund on behalf of an Eligible Employee.

In the event, an Employer is charged with any of the costs hereinabove set forth, the Employer may proceed in accordance with the Grievance Procedure provided elsewhere in this Agreement.

Section 4. Union Protection

In the event the specified contributions are not paid by the fifteenth (15th) day of the month, as above provided, the proper Union official may issue to the Employer a delinquent notice requesting payment within seventy-two (72) hours; if all delinquent contributions are not paid within that period, the employees of such employer and their

representatives shall have the right to take such action as may be necessary until the delinquent payments are made. It is further agreed that in the event such action is taken; the Employer shall be responsible to the Employees for losses resulting there from.

Any and all claims for an eligible employee which should be covered and have not been covered because of contribution deficiencies shall be the responsibility of the Employer.

### Section 5. Employer Contributions During Employee Disability

The Employer shall make a contribution on behalf of an eligible employee who has not otherwise qualified under Section 13.2 above, and who is disabled because of accident or illness and unable, to perform the work assigned to him by the Employer, during the following periods:

| Pay Monthly Contributions for: | When the Employee has been employed: |
|---|---|
| 3 months | less than one (1) year |
| 6 months | one (1) year to three (3) years |
| 9 months | more than three (3) years |
| 12 months | for occupational injury |

### ARTICLE VIIII - PENSION FUND

### Section I. Employer Contributions:

(a) The Employer agrees to make the following monthly contributions to the Central Pennsylvania Teamsters Pension Fund (the Fund) for each eligible employee covered by this Agreement, in accordance with the Declaration of Trust, Defined Benefit Plan, and the Retirement Income Plan executed by the Employer, subject to the qualifications hereinafter specified:

Effective April 1, 2010 ...................... $520.00 per Employee per month

Effective April 1, 2011 ...................... $530.00 per Employee per month

Effective April 1, 2012 ...................... $550.00 per Employee per month

(b)  Monthly contributions for each Eligible Employee shall be paid not later than the fifteenth (15th) day of the following month.

(c)  The Employer shall use the reporting forms required by the Trustees of the Fund (the Trustees) and shall comply with the instructions of the Trustees, filling out such forms. This applies to contributions which are payable and to reporting the hours of service for each Eligible Employee.

Section 2. Eligibility of Employees

(a)  All existing employees, and all new Employees shall be eligible for participation in and for contributions to the Fund after they have been on the payroll of the Employer for thirteen (13) weeks.

(b)  In determining the initial thirteen (13) week period a new employee shall be deemed to be on the payroll of the Employer each week they are assigned and work three (3) separate work periods during one (1) work week, or are assigned and work twenty (20) hours or more in less than three (3) separate work periods during one (1) work week.

(c)  The specified monthly contributions shall be paid beginning with the month in which an employee has completed thirteen (3) weeks of employment.

(d)  After completing the thirteen (13) weeks of employment, the specified contribution shall be paid for each calendar month an Employee is credited with eight six (86) hours or more, regardless as to classification of casual, probationary, temporary, etc.  If an Eligible Employee is credited with less than 86 hours in a calendar month, the Employer shall report to the Trustees the actual hours credited even though no contribution is due.

Section 3. Audit and Penalties

The Trustees shall have the authority to audit the payroll and wage records of the Employer for the purpose of determining, the accuracy of contributions to the Pension Fund.  The audit shall be completed at a mutually agreeable time and at no cost to the Employer. In the event it is found that the Employer has not been complying with the provisions of this Agreement, the Employer shall pay the following:

11

(1) The full cost of the audit;

(2) Any damages allowed by law based on the above or on any other amounts which should have been paid to the Fund on behalf of an Eligible Employee.

In the event an Employer is charged with any of the costs hereinabove set forth, the Employer may proceed in accordance with the Grievance Procedure provided elsewhere in this Agreement.

Section 4. Union Protection

In the event the specified contributions are not paid by the fifteenth (15th) day of the following month, as above provided, the proper Union official may issue the contributing Employer a delinquent notice requesting payment within seventy-two (72) hours; if all delinquent contributions are not paid within that period, the employees of such Employer and their representatives shall have the right to take such action as may be necessary until the delinquent payments are made. It is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting there from.

Any and all claims for an Eligible Employee which should be covered and have not been covered because of contribution deficiencies shall be the responsibility of the Employer.

Section 5. Employer Contributions During Employee Disability

(a) The Employer shall make a contribution on behalf of an eligible employee, who has not otherwise qualified under Section 2 above and who is disabled because of accident or illness and unable to perform the work assigned to them by the Employer, during the following periods:

| Pay monthly Contribution For: | When Employee has been Employed: |
|---|---|
| 3 Months | Less than 5 Years |
| 6 Months | 5 Years to 10 Years |
| 9 Months | More than 10 Years |
| 12 Months | For occupational injury |

(b) The stated initial thirteen (13) week period of eligibility shall not apply to an employee who becomes disabled on the job. The Employer agrees to pay the monthly contributions for an

12

employee disabled on the job according to the schedule listed above, regardless of whether or not that employee has completed his initial period of eligibility.

(c) When absence because of accident or sickness disability begins on or before the fifteenth (15th) day of the month, the monthly contribution for that month shall be deemed the first contribution for accident or sickness disability.

(d) When absence because of accident or sickness disability begins an or after the sixteenth (16th) day of the month, the monthly contribution for the following month shall be deemed the first contribution for accident or sickness disability.

(e) The Employer shall resume regular monthly contributions when an employee has returned to work after absence because of accident or sickness disability:

> (1) Beginning with the month during which the employee returns to work, when they return to work on or before the fifteenth (15th) day of the month.

> (2) Beginning with the month following his return to work when he returns to work on or after the sixteenth (16th) day of the month.

### ARTICLE IX - SENIORITY

Section 1.

(a) Seniority is measured by length of continuous service with the Employer.

(b) Review at 30 days for probationary period, if not granted full status, then the process will go for the full ninety (90) calendar day probationary period, during which period employee may be terminated or disciplined without further recourse. The grievance procedure shall not apply to Employee during probationary period. The Employer is not required to give an explanation for termination or discipline during such period. The Employer shall advise the Local Union, in writing, when a probationary employee is terminated or disciplined.

(c) In engaging or dismissing employees because of lack of business, the Employer shall conform to the ordinary rules of seniority; in promoting employees to jobs within this Agreement, the Employer shall have the right to select qualified persons, but between qualified persons, preference shall be given according to seniority.

(d) If a front discharge truck with a junior employee on overtime is dispatched at the same time a rear discharge truck with a senior man is available, the company must produce evidence

13

that the customer demanded a front discharge truck. The Company reserves the right to send a FDM if it feels it is in the best interest of the company for that order.

(e) In the case of temporary layoff, the employees will be given the opportunity to volunteer for layoff.   This voluntary layoff will be conducted by classification, with the most senior employees being given the opportunity to accept the layoff in lieu of junior employees being forced to layoff status. When the senior employee's cobra rate goes to the full rate, the senior employee will be able to bump the junior employee into layoff status. Once the junior employee goes into layoff status, the employee will  be given the opportunity - to pay his cobra rate for three (3) months at one-half (1/2)  rate.

Section 2: Selection of Employees

When the Employer needs additional men, he shall give the Local Union equal opportunity with all other sources in finding suitable applicants, but the Employer shall not be required to hire those referred by the Local Union.

Section 3 : Classification of Employees

Classifications recognized under this Agreement shall be:

> Driver
> Batch Person
> Mechanic
> Yard Leader

Employer shall post all new jobs and permanent vacancies and list classifications. Awards to be made to senior qualified employee. Job assignments shall he made in accordance with the above classification recognizing seniority within each classification.

Employees presently performing these jobs should be classified as such. There shall be a ninety (90) work day probationary period for the classification of batch person. This shall include any new hires and employees bidding such.

Section 4: Classification Description

The job classification of driver is responsible for, but not limited solely to, the following tasks: driving a concrete truck, general maintenance on the truck and keeping it in a presentable condition, and is required to assist as needed in maintaining the plant and yard.

The job classification of mechanic is responsible for, but not limited solely to the following tasks: maintaining safe vehicles for use, for repairing damaged vehicles or equipment, and aiding the shop leader as directed. Mechanics shall notify shop leader or management of any unsafe or faulty equipment.

The job classification of batch person is responsible for batching out orders taken by the dispatcher. The position is responsible for helping coordinate with the dispatcher to best maximize the Company's work force and service customers.

The classification of yard leader is responsible for, but not solely limited to the following tasks: coordinating the yard and driver activities, such as assigning tasks and work schedules, coordinating with the dispatcher and plant superintendent, coordinating work with the shop leader, and be responsible for testing of materials, thus requiring a PennDOT certification. This position has no authority in terms of hiring, firing, or suspending any fellow worker. This position is not required to be filled at all times.

## ARTICLE X - GENERAL PROVISIONS

### Section 1 – Written or Verbal Agreements

It is agreed by the party of the first part that no employee will be asked to make any written or verbal agreement which in any way conflicts with this Agreement.

### Section 2 - Time Reports

It is agreed that time reports may not be erased or changed. However, in case of dispute, differences must be settled in the presence of the Shop Steward, particular employee involved, and particular individual who has supervision of time reports. Should the aforementioned individuals find it necessary to change the time reports, it must be done in their presence.

### Section 3 - Equipment

Employer shall not hire equipment until his own available usable equipment is exhausted.

### Section 4 - Loss or Damage

An employee shall not be compelled to pay for loss or damage to freight or equipment unless it shall be proven that such loss or damage was caused directly by his willful negligence.

Section 5. Military Service

Employees called for military service shall retain their places on the seniority list provided they are able to perform the work and have applied for work within ninety (90) days after discharge from military service.

Section 6. Batch Person

A worker in the classification of batch person at a Ready Mixed plant may be allowed to return to driver classification provided the following steps are taken:

1. Employee must notify Employer thirty (30) days in advance of his intention to driver classification. This can be extended if mutually agreed upon.
2. It is understood that the employee loses his batch person classification entirely. He has no seniority rights in batch person classification once he leaves.
3. Employee returns to driver classification at no loss of seniority in driver classification.
4. In the event of an emergency, vacation or other extenuating circumstances, the company reserves the right to require the former batch person to return to batch person classification, on a temporary basis.

If Quarryville becomes a one person plant, a Union batchman could also be responsible for dispatching, loading bins and yard supervision.

Section 7. Family Medical Leave

The Company will comply with the Family Medical Leave Act as the law requires.

Section 8. Time off for Union Activities

The Employer agrees to grant the necessary time off without discrimination or loss of seniority rights and without pay, to any employee designated by the Union to attend a Labor Convention or serve in any capacity on other Union Business, provided two (2) weeks written notice is given to the Employer by the Union, specifying length of time off. Should business levels change in the two (2) week notification period, the Union will be notified by the Employer and adjustments made to accommodate both parties. The Union agrees that, in making its request for time off for Union activities, due consideration shall be given to the number of people affected in order that there shall be no disruption of the Employer's operation due to lack of available employees.

Agreements between the individual Employer and the Local Union involved regarding employees on Leave of Absence because of employment by the Union, shall prevail. A Union member elected or appointed to serve as a Union Official shall be granted a Leave of Absence during the period of employment in such position without discrimination or loss of seniority rights and without pay.

Section 9.

Management can only do bargaining unit work when there are no qualified Union employees available to do the work. If employees are in the layoff mode, said employees will be notified of the work and brought in to perform the task. Until the employee is at the worksite, management will be able to perform the assignment.

Section 10.

Equipment added to the fleet and assigned to operations on a regular basis, whether newly manufactured or not newly manufactured will be air-conditioned if mechanically possible. This will be done at the Company's earliest convenience.

Equipment added to the fleet and assigned to operation on a regular basis whether newly manufactured or not newly manufactured will be fitted with compression brakes if mechanically possible. This will be done at the Company's earliest convenience.

Section 11.

On days of slow business, management can elect to bring in a group of workers in order to maximize efficiency. This will be done by bringing in the most senior group of workers that can accomplish a given task. (This does not mean the most senior employees will be brought in for the period, but rather, the most senior group that can accomplish a given set of tasks for that duration will be utilized). During these periods, employee's may/shall be required to perform work in other job classifications in order to ensure productivity.

Section 12.

Management, on an individual basis, may elect to have a multi-skilled junior employee work over a senior employee, if it is practical to have a multi-skilled employee (i.e. one that can run loader, drive dump truck, etc.) and the senior employee is not considered multi-skilled. Should

17

it become practical to train a more senior employee, or if the temporary position may become of a more extended nature, the company will afford an employee an opportunity to learn if it is deemed reasonable. The company also encourages that when that senior employee is passed over for a multi-skilled employee, that the senior employee, on his own time, comes to work and spends time with the aforementioned junior employee, so he as well can become multi-skilled in this area.

## ARTICLE XI - JOB STEWARDS

The Employer recognizes the right of the Union to designate Job Steward and Alternate. The authority of Job Steward and Alternate so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

1. Investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement. The investigation and the presentation of grievances will be done on company time. The investigation will he done in a timely fashion and shall cause no disruption to the Employer's operation;

2. Collection of dues when authorized by appropriate Local Union action,

3. Transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

    a. have been reduced to writing, or

    b. if not reduced to writing, are of a routine nature and do not involve work stoppage, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

Job Steward and Alternate have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.

The Employer recognizes these limitations upon the authority of Job Steward and Alternate, and shall not hold the Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event Shop Steward has taken unauthorized strike action, slowdown, or work stoppage in violation of its Agreement.

Stewards shall be permitted to investigate, present, and process grievances on or off the property of the Employer, without loss of time or pay, during working hours. Such time spent in handling grievances shall be considered working hours in computing daily and/or weekly overtime.

## ARTICLE XII - PROTECTION OF RIGHTS

Section 1. Picket Lines

It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a primary labor dispute or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's place of business.

Section 2. Struck Goods

It shall not be a violation of this Agreement and it shall not be a cause for discharge or disciplinary action if any employee refuses to perform any service which his Employer undertakes to perform as an ally of an Employer or person - on strike and which service, but for such strike, would be performed by the employees of the Employer or person on strike.

## ARTICLE XIII - GRIEVANCE PROCEDURE

Section 1.

A grievance is hereby jointly defined to be any controversy, complaint, misunderstanding, or dispute. Any grievance arising between the Employer and the Union or an Employee represented by the Union shall be settled in the following manner:

1. The aggrieved employee or employees must present the grievance to the Job Steward within five (5) working days after the reason for the grievance has occurred, except no time limit shall apply in case of violation of wage provisions of this Agreement. If a satisfactory settlement is not effected with the foreman

within three (3) working days, the Job Steward and employee shall submit such grievance in writing to the Union's Business Representative.

2. The Business Representative shall then take the matter up with a representative of the Employer with authority to act upon such grievance. A decision must be made within five (5) working days.

3. If the Employer fails to comply with any settlement of the grievance or fails to comply with the procedures of this Article, the Union has the right to take all legal and economic action to enforce its demands.

<u>Section 2.</u>

Any Job Steward shall be permitted to leave his or her work to investigate and adjust the grievance of any employee within his jurisdiction, after notification to his supervisor.   Employees shall have the Job Steward or a representative of the Union present during the discussion of any grievance with representatives of the Employer.

<u>Section 3.</u>

The Union or the Employer may, in order to resolve a grievance involving contractual language, suspension or discharge prior to arbitration, utilize either a state or federal mediation at this step. Both the Employer and the Union must mutually agree to this step. Additionally, both parties must agree if the decision of the mediator will be final and binding.

## <u>ARTICLE XIV - ARBITRATION PROCEDURE</u>

<u>Section 1.</u>

If no satisfactory settlement can be agreed upon, the parties shall select a mutually agreeable and impartial arbitrator within ten (10) days after disagreement. In the event they are unable to so, the matter shall be referred to the American Arbitration Association the next day. After the service submits a list of arbitrators to the Union and the Employer, they shall reply with their preferred selections no later than three (3) days after receipt of such list. The expense of the Arbitrator selected or appointed shall be borne equally by the Employer and the Union.

Section 2.

The Arbitrator shall not have the authority to amend or modify this Agreement or establish new terms or conditions under this Agreement. The Arbitrator shall determine any question of arbitrability. In the event the position of the Union is sustained, the aggrieved party shall be entitled to all the benefits of this Agreement which would have accrued to them had there been no grievance.

Section 3.

Both parties agree to accept the decision of the Arbitrator as final and binding. If the Employer is to comply with the award of the Arbitrator or with the procedures of this Article, the Union has a right to take all legal and economic action to enforce compliance.

## ARTICLE XV - DISCHARGE OR SUSPENSION

Section 1.

The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension, shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, except that no warning notice need be given to any employee before employee is discharged if the cause of such discharge is: dishonesty, proven theft, drunkenness, drinking alcoholic beverages, or while under the influence of alcoholic beverages, narcotics, or unlawful drugs, the use of narcotics, barbiturates, or amphetamines; the possession of unlawful drugs; refusal to submit to a breathalyzer, other sobriety or blood alcohol test; recklessness resulting in a serious accident while on duty; failure to report an accident; unprovoked assault on the Employer, Employee, or supervisor; carrying of unauthorized passengers, willful abuse of Employer's equipment, failure to comply with CRH fatality elimination fundamentals, or failure to comply with fall protection policy.

The warning notice as herein provided shall not remain in effect for a period of more than nine (9) months from the date of occurrence upon which the complaint and warning notice are based.

The warning notice shall be issued no later than seven (7) days from the date became aware of the occurrence. If the Company places the employee under a letter of investigation the action waives the seven (7) day time frame. This letter of investigation is good for thirty (30) days from the incident. Four step process:

1. Verbal/written warning
2. 1 day suspension
3. 3 day suspension
4. Termination

For all offenses, no new process for each offense in a nine month period.

<u>Section 2.</u>

Any employee discharged must be paid in full all wages owed them by the Employer, including earned vacation pay, after employee has exhausted all avenues of the grievance procedure.

<u>Section 3.</u>

A discharged or suspended employee must advise their Local Union in writing within five (5) working days after receiving notification of such action against them, of their desire to appeal their discharge or suspension. Notice of appeal from discharge or suspension must be made to the Employer in writing within ten (10) days from the date of the discharge or suspension and/or return to their home terminal, whichever is later.

<u>Section 4.</u>

Should it be proven that an injustice has been done to a discharged or suspended employee, they shall be fully reinstated in their position and compensated at their usual rate for lost work opportunity. If the Union and the Employer are unable to agree to the settlement of the case, then it may be referred to the grievance machinery as set forth in Article XIV, within five (5) days after the above notice of appeal is given to the Employer.

## ARTICLE XVI -MAINTENANCE OF STANDARDS

The Employer agrees that any covered employee whose wages or fringe benefits exceed those set forth in the Agreement shall suffer no reduction of wages or fringe benefits during the term of this Agreement.

## ARTICLE XVII - LIE DETECTOR TEST

The Employer shall not require, request, or suggest that an employee or applicant for employment take a polygraph or any other form of lie detector test.

## ARTICLE XVIII-NONDISCRIMINATION POLICY

Section 1.

The Employer and the Union shall not discriminate against any individual in contradiction of federal, state or local laws with respect to hiring, compensation, terms, or conditions of employment based upon the individual's race, religion, color, sex, age (over forty), national origin, veteran's status or non job related physical, mental disability or sexual preference. The Age Discrimination in Employment Act of 1967 and the Pennsylvania Human Relations Act prohibit discrimination on the basis of age with respect to individuals who are at least 40 years of age. The Americans with Disabilities Act prohibit, discrimination against qualified individuals with a disability.

Section 2.

The Employer and the Union agree that there will be no discrimination by the Employer or the Union against any employee because of any employee's lawful activity and/or support of the Union.

## ARTICLE XIX – CHECKOFF

Section 1.

From the pay for the third week of each month, the Employer shall deduct the dues which may be due by the employee for the next succeeding month for any employee who shall have authorized, in writing, the Employer to so deduct dues. In the case of a new employee, the Employer shall, from the first pay after the expiration of thirty (30) days from commencement of employment, deduct the whole initiation fee. All sums deducted shall be remitted to an authorized agent of the Union not later than the first day of each month.

<u>Section 2.</u>

The Employer will recognize a lawful, voluntary authorization for the Teamsters Political Action Committee deduction from wages, to be transmitted by the Local Union to such Committee as the Local Union may lawfully designate. The Teamsters Political Action Committee deduction shall be made annually.

## ARTICLE XX - JURY DUTY

In the event an employee is called for jury duty by a count of Commonwealth of Pennsylvania or by the Federal Court of the district which the employee resides, and if the employee loses all or part of his working time on account of such jury service, the company shall supplement the pay received by such employee for such jury duty in an amount sufficient to provide such employee up to a maximum of one (1) jury term in any one (1) year period, with wages equal in amount to wages such employee would have received from the Employer for straight time work had the employee been available for work during such period of time. Employees called for jury duty shall notify the Employer as soon as practicable, but in no event later than five (5) days after jury notice is received.

## ARTICLE XXI – MANAGEMENT RIGHTS

<u>Section 1.</u>

The management of the work, the direction of the working force, assignment of workers to specific projects and the right to hire and discharge for just cause are vested exclusively in the Company. The Company will have no obligation to operate in specific territories and will not Be held to a territorial map.  Dispatching of work will be at the sole discretion of the company.  It is not the. intention of this provision to encourage the discharge of employees.

<u>Section 2.</u>

The number of workers in any classification to be employed shall be at the sole discretion of the employer. The size of the working force shall be considered a function of the Company's business and decisions regarding the number of workers to be employed rest solely with the Company.

24

Section 3.

Decisions regarding the use of land and equipment owned by the Company shall be left solely to the Company. The Company recognizes its responsibility to comply with applicable safety standards.

Section 4.

All the provisions of this Article shall be subject to all the other provisions of this Agreement.

## ARTICLE XXI – TERM OF AGREEMENT

This agreement shall become effective as of April 1, 2010 until and, including March 31, 2013, and shall continue in full force and effect from year to year, for one (1) year periods, unless, either party shall notify the other by certified letter, not later than sixty (6O) days prior to the expiration date in 2013 or in subsequent year, of an intention to have same changed.


IN WITNESS WHEREOF the parties have hereunder set their hands and seals.

For the Union:                                    For the Employer:


_____                _____
Howard W. Rhinier                              Melissa Devitz
Secretary-Treasurer                            Director of Human Resources


_____                _____
James Wardrop, Jr.                              Brian Groff
Business Agent                                     Vice President of Concrete

# EXHIBIT D

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
FOURTH REGION

CHAUFFEURS, TEAMSTERS, AND
HELPERS LOCAL UNION No. 771,
affiliated with INTERNATIONAL
BROTHERHOOD OF TEAMSTERS and
its JOINT COUNCIL NO. 53


        and                 Case   4–CB–10482

PENNSY SUPPLY, INC. d/b/a READY–
MIXED CONCRETE

## COMPLAINT AND NOTICE OF HEARING

Pennsy Supply, Inc. d/b/a Ready–Mixed Concrete, herein called the Employer, has charged that Chauffeurs, Teamsters, and Helpers Local Union No. 771, affiliated with International Brotherhood of Teamsters and its Joint Council No. 53, herein called Respondent, has been engaging in unfair labor practices as set forth in the National Labor Relations Act, 29 U.S.C. Section 151 *et seq.*, herein called the Act. Based thereon, the Acting General Counsel, by the undersigned, pursuant to Section 10(b) of the Act and Section 102.15 of the Rules and Regulations of the National Labor Relations Board, herein called the Board, issues this Complaint and Notice of Hearing and alleges as follows:

1.     The charge in this proceeding was filed by the Employer on April 30, 2010, and a copy was served by first class mail on Respondent on May 3, 2010.

2.     (a)     At all material times, the Employer, a Pennsylvania corporation with a facility at 139 North Church Street, Quarryville, Pennsylvania, herein called the Facility, has been engaged in the production and transport of asphalt and concrete in Lancaster County, Pennsylvania.

        (b)     During the past year, the Employer, in conducting its business operations described above in subparagraph  (a), purchased and received at the Facility goods valued in excess of $50,000 directly from points outside the Commonwealth of Pennsylvania.

        (c)     At all material times, the Employer has been an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.

3. At all material times, Respondent has been a labor organization within the meaning of Section 2(5) of the Act.

4. At all material times, the following individuals held the positions set forth opposite their respective names and have been agents of Respondent within the meaning of Sections 2(13) and 8(b) of the Act:

Howard W. Rhinier   —   Secretary–Treasurer
James S. Wardrop Jr   —   Business Agent

5. (a) The Employer's truck drivers, helpers, mechanics, yard persons and plant persons based at the Facility, herein called the Unit, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act: employed by the Employer.

(b) On or about September 1, 2007, the Employer adopted the collective bargaining agreement, herein called the Prior Agreement, between Respondent and Ready—Mixed Concrete Company of Lancaster. The Prior Agreement was effective by its terms from April 1, 2007 through March 31, 2010. Pursuant to the Prior Agreement, the Employer recognized Respondent as the exclusive collective bargaining representative of the Unit.

(c) At all material times, since September 1, 2007, based on Section 9(a) of the Act, Respondent has been the exclusive collective–bargaining representative of the Unit.

6. (a) On or about April 6, 2010, Respondent and the Employer reached complete agreement on terms and conditions of employment of the Unit, herein called the Agreement, to be incorporated in a collective bargaining agreement effective from April 1, 2010 through March 31, 2013.

(b) On or about April 14, 2010, Respondent, by James S. Wardrop Jr., and again by Howard W. Rhinier, repudiated the Agreement.

7. By the conduct described above in paragraph 6(b), Respondent has been failing and refusing to bargain collectively with the Employer in violation of Section 8(b)(3) of the Act.

8. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an Answer to the Complaint. The Answer must be **received by this office on or before September 10, 2010, or postmarked on or before September 9, 2010.** Unless filed electronically in a pdf format, Respondent should file an original and four copies of the Answer with this Regional Office.

2

An Answer may also be filed electronically by using the E–Filing system on the Agency's website. In order to file an Answer electronically, access the Agency's website at **http://www.nlrb.gov,** click on the **E–Gov tab,** select **E–Filing, and then follow the detailed instructions.** The responsibility for the receipt and usability of the Answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E–Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than two (2) hours after 12:00 noon (Eastern Time) on the due date for the filing, a failure to timely file the Answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off–line or unavailable for some other reason. The Board's Rules and Regulations require that an Answer be signed by counsel or non–attorney representative for represented parties or by the party if not represented. See Sections 102.21. If the Answer being filed electronically is a pdf document containing the required signature, no paper copies of the document need to be transmitted to the Regional Office. However, if the electronic version of the Answer to a Complaint is not a pdf file containing the required signature, then the E–filing rules require that such Answer containing the required signature be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.

Service of the Answer on each of the other parties must be accomplished in conformance with the requirements of Section 102.114 of the Board's Rules and Regulations. The Answer may **not** be filed by facsimile transmission. If no Answer is filed, or if an Answer is untimely filed, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Complaint are true.

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that at **10:00 a.m.** on **November 2, 2010,** and on consecutive days thereafter until concluded, a hearing will be conducted before an Administrative Law Judge of the National Labor Relations Board in a hearing room of the National Labor Relations Board, Region 4, 615 Chestnut Street, 7th Floor, Philadelphia, Pennsylvania. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Complaint. The procedures to be followed at the hearing are described in the attached Form NLRB–4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB–4338.

Signed at Philadelphia, Pennsylvania on this 27th day of August, 2010.

*Dorothy L. Moore-Duncan*
**DOROTHY L. MOORE–DUNCAN**
Regional Director, Fourth Region
National Labor Relations Board

3

**FORM NLRB 4338**

UNITED STATES GOVERNMENT

## NATIONAL LABOR RELATIONS BOARD

### NOTICE

Case:   4-CB-10482

*revised 11/7/94*

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end. An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.

However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1)     The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 FR 102.16(b).

(2)     Grounds must be set forth in *detail;*

(3)     Alternative dates for any rescheduled hearing must be given;

(4)     The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; *and*

(5)     Copies must be simultaneously served on all other parties (*listed below*), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

James S. Wardrop Jr., Business Agent
Helpers Local Union No. 771, a/w
 International Brotherhood of Teamsters
 And its Joint Council No. 53
1025 N. Duke Street
Lancaster, PA  17602
(C. 7009 1680 0000 5279 5215 RRR)

Ira H. Weinstock, Esquire
Law Offices of Ira H. Weinstock
800 N. Second Street, Suite 100
Harrisburg, PA  17102
(C. 7009 1680 0000 5279 5722 RRR)

Vincent Candiello, Esquire
17 N. Second Street, 12th Floor
Harrisburg, PA  17101-1601
(C. 7009 1680 0000 5279 5739)

Toni Robertson, VP Human Resources
Pennsy Supply Inc. d/b/a Ready Mix Concrete
1001 Paxton Street
Harrisburg, PA  17105
(C. 7009 1680 0000 5279 5746)

FORM NLRB-4668
(4-05)

(C CASES)

# SUMMARY OF STANDARD PROCEDURES IN FORMAL HEARINGS HELD
## BEFORE THE NATIONAL LABOR RELATIONS BOARD
## IN UNFAIR LABOR PRACTICE PROCEEDINGS PURSUANT TO
## SECTION 10 OF THE NATIONAL LABOR RELATIONS ACT

The hearing will be conducted by an administrative law judge of the National Labor Relations Board who will preside at the hearing as an independent, impartial finder of the facts and applicable law whose decision in due time will be served on the parties. The offices of the administrative law judges are located in Washington, DC; San Francisco, California; New York, N.Y.; and Atlanta, Georgia.

At the date, hour, and place for which the hearing is set, the administrative law judge, upon the joint request of the parties, will conduct a "prehearing" conference, prior to or shortly after the opening of the hearing, to ensure that the issues are sharp and clearcut; or the administrative law judge may independently conduct such a conference. The administrative law judge will preside at such conference, but may, if the occasion arises, permit the parties to engage in private discussions. The conference will not necessarily be recorded, but it may well be that the labors of the conference will be evinced in the ultimate record, for example, in the form of statements of position, stipulations, and concessions. Except under unusual circumstances, the administrative law judge conducting the prehearing conference will be the one who will conduct the hearing; and it is expected that the formal hearing will commence or be resumed immediately upon completion of the prehearing conference. No prejudice will result to any party unwilling to participate in or make stipulations or concessions during any prehearing conference.

*(This is not to be construed as preventing the parties from meeting earlier for similar purposes. To the contrary, the parties are encouraged to meet prior to the time set for hearing in an effort to narrow the issues.)*

Parties may be represented by an attorney or other representative and present evidence relevant to the issues. All parties appearing before this hearing who have or whose witnesses have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603, and who in order to participate in this hearing need appropriate auxiliary aids, as defined in 29 C.F.R. 100.603, should notify the Regional Director as soon as possible and request the necessary assistance.

An official reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the administrative law judge for approval.

All matter that is spoken in the hearing room while the hearing is in session will be recorded by the official reporter unless the administrative law judge specifically directs off-the-record discussion. In the event that any party wishes to make off-the-record statements, a request to go off the record should be directed to the administrative law judge and not to the official reporter.

Statements of reasons in support of motions and objections should be specific and concise. The administrative law judge will allow an automatic exception to all adverse rulings and, upon appropriate order, an objection and exception will be permitted to stand to an entire line of questioning.

All exhibits offered in evidence shall be in duplicate. Copies of exhibits should be supplied to the administrative law judge and other parties at the time the exhibits are offered in evidence. If a copy of any exhibit is not available at the time the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the administrative law judge before the close of hearing. In the event such copy is not submitted, and the filing has not been waived by the administrative law judge, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

Any party shall be entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. In the absence of a request, the administrative law judge may ask for oral argument if, at the close of the hearing, it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

(OVER)

Form NLRB-4668 (4-05) *Continued*

In the discretion of the administrative law judge, any party may, on request made before the close of the hearing, file a brief or proposed findings and conclusions, or both, with the administrative law judge who will fix the time for such filing. Any such filing submitted shall be double-spaced on 8½ by 11 inch paper.

Attention of the parties is called to the following requirements laid down in Section 102.42 of the Board's Rules and Regulations, with respect to the procedure to be followed before the proceeding is transferred to the Board:

No request for an extension of time within which to submit briefs or proposed findings to the administrative law judge will be considered unless received by the Chief Administrative Law Judge in Washington, DC (or, in cases under the branch offices in San Francisco, California; New York, New York; and Atlanta, Georgia, the Associate Chief Administrative Law Judge) at least 3 days prior to the expiration of time fixed for the submission of such documents. Notice of request for such extension of time must be served simultaneously on all other parties, and proof of such service furnished to the Chief Administrative Law Judge or the Associate Chief Administrative Law Judge, as the case may be. A quicker response is assured if the moving party secures the positions of the other parties and includes such in the request. All briefs or proposed findings filed with the administrative law judge must be submitted in triplicate, and may be printed or otherwise legibly duplicated with service on the other parties.

In due course the administrative law judge will prepare and file with the Board a decision in this proceeding, and will cause a copy thereof to be served on each of the parties. Upon filing of this decision, the Board will enter an order transferring this case to itself, and will serve copies of that order, setting forth the date of such transfer, on all parties. At that point, the administrative law judge's official connection with the case will cease.

The procedure to be followed before the Board from that point forward, with respect to the filing of exceptions to the administrative law judge's decision, the submission of supporting briefs, requests for oral argument before the Board, and related matters, is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be served on the parties together with the order transferring the case to the Board.

Adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations. If adjustment appears possible, the administrative law judge may suggest discussions between the parties or, on request, will afford reasonable opportunity during the hearing for such discussions.